CARTER PRODUCTS, Inc., v. FEDERAL TRADE COMMISSION.

No. 12940.

United States Court of Appeals
Ninth Circuit.

Jan. 19, 1953.

Rehearing Denied March 13, 1953.

Breed, Abbott & Morgan, New York City, Brobeck, Phleger & Harrison, San Francisco, Cal. (William L. Hanaway and Stoddard B. Colby, New York City, Herman Phleger and Alvin J. Rockwell, San Francisco, Cal., of counsel), for petitioner.

W. T. Kelley, General Counsel, FTC, Robert B. Dawkins, Asst. Gen. Counsel, Fletcher G. Cohn, Sp. Atty., and Jno. W. Carter, Jr., Attorney, FTC, Washington, D.C., for respondent.

Before HEALY, BONE, and ORR, Circuit Judges.

HEALY, Circuit Judge.

This case is before the court on petition to review and set aside an order of the Federal Trade Commission pertaining to a product labeled "Carter's Little Liver Pills, A laxative aiding bile flow."

In summary, the Commission found that the product does not stimulate the liver, aid the flow of bile, or have a therapeutic value in the treatment of any condition or disorder of the liver. The order does not prohibit the continued sale and distribution of the pills as a laxative, but does require the producer to cease and desist from all advertising claims relative to their therapeutic action on the liver or the flow of the bile, and it directs the excision of the word "Liver" from the trade name.

Questions pertaining to the sufficiency of the evidence or to the merits are not presented by the petition. What is claimed, principally, is that a fair hearing was denied petitioner in that the trial examiner unduly and prejudicially restricted its right of cross-examining certain of the Commission's expert witnesses upon whose testimony, in large measure, the findings and order were based.[1] The witnesses in question were Doctors Carlson, Bollman, Lockwood, and Case. We are of opinion that petitioner's claim is well grounded in respect of the three experts last named, but not in respect of the witness Carlson.

1. Dr. Carlson, a specialist in physiology, testified that Carter's pills, the ingredients of which are aloes and podophyllum, have no known therapeutic action over and beyond their laxative properties, and none upon the liver. He professed himself as being "pretty familiar" with the literature on the subject of the liver and the gastro-intestinal tract, and said that it is the consensus of informed medical opinion that aloes and podophyllum are capable of no action on the functioning of the liver. On cross-examination he was asked whether he knew a Dr. Alvarez of the Mayo Foundation and whether he was familiar with the latter's book entitled "Nervousness, Indigestion and Pain," and he replied that he knew Alvarez and had read his book. He said Alvarez "is pretty well informed, but that does not mean that I regard him as sound on all points. I have differed with him on many things, particularly on motility of the gastro-intestinal tract." He added that in formulating his views he had not relied on the works of Dr. Alvarez. Counsel for the petitioner then proposed to read to the witness an excerpt from the book and to question him concerning the same. The trial examiner sustained an objection and ruled that in order to permit the reading of excerpts from a treatise into the record on cross-examination it must first be shown that the witness had predicated his testimony in whole or in part upon the particular book or the particular author.

Later on, counsel questioned the witness concerning a medical dictionary that apparently had the blessing of the American Medical Association, or at any rate of Dr. Fishbein, and offered to read from it. As regards this book Carlson said it was authoritative as a dictionary but not as a scientific work. The examiner sustained an objection to the reading on the same ground as before.

These are the only specific offers of this nature we have been able to find in the record in connection with the cross-examination of Carlson. A study of his testimony on direct shows that the opinions he expressed were based on his own knowledge and experience and on treatises of medical men, particularly those in the field of internal medicine, whom he regarded as informed on the subject. We are not prepared to hold that the rulings of

---

[1]. Petitioner also urges that fatal error was committed in admitting evidence pertaining to certain experiments on dogs and human patients. In our opinion the objection to these experiments, several of which will be mentioned hereafter, goes to their weight only, not to their admissibility.

the examiner in these instances amounted to an abuse of discretion. The general view is that medical treatises are not in themselves competent evidence, since they constitute statements made out of court by persons not available for cross-examination. A conflict of authority exists as to the use that may be made of them in the cross-examination of experts, many courts holding that they may not be used unless the witness on direct has based his opinions wholly or in part on a particular author, in which case the authority may of course be used for the purpose of contradicting or discrediting the witness.[2] Here, unlike the situation in Reilly v. Pinkus, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63, no issue of fraudulent intent was involved.

Turning, however, to the cross-examination of the other experts mentioned, we think the rulings of the examiner tended to be insufferably technical where not wholly erroneous.

2. Dr. Bollman, called by the Commission, was a physiologist and biochemist of note. Among numerous other activities he served as an assistant director of the Mayo experimental research laboratory, organizing and carrying on a program which he said might be covered by the broad term "Experimental Pathology," embracing physiology, biochemistry and pathology. Most of his time had been spent in problems associated with the liver, and he had done considerable work on the gastrointestinal tract. A bibliography listing 166 of his published articles was introduced in evidence by the Commission.

A witness for the petitioner, Dr. Morrison, had testified to experiments and tests designed to show that the relief of constipation by Carter's Little Liver Pills stimulated the flow of bile. Dr. Bollman undertook to discredit the findings of Morrison by means of an elaborate statistical document or chart which he had prepared and which he said was a method of his own for analyzing and criticizing Dr. Morrison's experiments and data, this document, marked Exhibit 202, being received in evidence over petitioner's objection. On cross-examination relative to this method Bollman said he had used the identical method in analyzing data in some of the scientific papers he had written. His attention was called to one of his articles and he was asked whether he had treated the data in that instance as he did Dr. Morrison's data, and he replied that he had not. For the announced purpose of testing the validity of the method he employed in his criticism of Morrison's data he was asked the following question: "Doctor, there are 166 of your publications listed in Commission's Exhibits 194–A to O and I will hand you that and ask you to point out if you can wherein you used the method represented by Commission's Exhibit 202 for analyzing Morrison's data in any one of your 166 articles?"

The question was objected to by counsel for the Commission, and in support of his interrogation petitioner's counsel stated: "I think since Dr. Bollman has reported on 166 different subject matters in his publications, many of which contain tables and sets of figures which are set forth to portray findings of facts that he made in his experiments, and since he had been called upon by the Commission to analyze the data of one of my former witnesses and has done it in a certain way which he states is the proper way to do it, and since the one and only paper of Dr. Bollman that I have in my possession now has been presented to him and he has testified that he did not use that method, that he used for analyzing Morrison's data in the article, although it contained sets of figures, I want to know where he has used it in any other, and whether he used it solely for analyzing his figures, and data in any of the other 165 articles that he has written."

2. For some of the cases pro or con see: Reck v. Pacific-Atlantic S.S. Co., 2d Cir., 180 F.2d 866; Mutual Benefit Health & Accident Ass'n v. Francis, 8th Cir., 148 F.2d 590; Laird v. Boston & M. R. R., 80 N.H. 377, 117 A. 591. Contra: Western Union Telegraph Co. v. Ammann, 3 Cir., 296 F. 453; Drucker v. Philadelphia, D. P. Co., 5 W.W.Harr. 437, 35 Del. 437, 166 A. 796; Commonwealth v. Phelps, 210 Mass. 109, 96 N.E. 69.

Consult also Wigmore on Evidence, 3 Ed., Vol. VI, § 1700.

The trial examiner ruled as follows: "I am going to sustain the objection and put the burden upon you [petitioner's counsel] of proving that the doctor's method is inherently wrong, and I am going to further assume for the purpose of the ruling that this is a novel method that he has developed which to him in his scientific way makes him believe that it is sufficient, and so let the exhibit stand just as it is."

█ Insisting upon his right to inquire, petitioner's counsel indicated his willingness to take Bollman's "best recollection" of the number of times he had used his method in the past without requiring him to go through the whole list of articles. The examiner, however, declined to change his ruling. It seems to us that counsel was entitled to put the matter into proper perspective by inquiring whether and to what extent the witness' method conformed to standards employed by himself in other similar tests which he had performed. The ruling foreclosed inquiry along this line, and would appear even to have cut off effective cross-examination as to whether the method conformed to accepted technical and scientific standards.

Another instance of undue restriction of the cross-examination of Dr. Bollman will be noticed. This witness had performed a series of tests on dogs, the object of which was to prove that constipation has no effect upon the secretion or flow of bile. The dogs were anesthetized with ether. Their colons were surgically severed and the lower end of the intestine sewed up so as to bring about a complete intestinal obstruction or "obstipation," a condition which the doctor said does not exist in man. With no means of elimination, the dogs were regularly fed on a diet including glucose until in a matter of days they died or were destroyed. All had peritonitis at the time of death. The results of the experiments were ascertained by autopsies after varying degrees of post-mortem degeneration had taken place. The witness said that these examinations showed no impairment of the liver function. He testified broadly on direct that the results of his experiments are translatable to the human being, and deduced therefrom and on the basis of his own knowledge that constipation in man in no way impairs the functioning of the liver, and that "there is no relationship between constipation and the secretion of bile by the liver."

On cross-examination counsel sought among other things to inquire whether, functionally, man and dog react to the same stimuli in the same manner. A question to this effect was objected to and the examiner ruled: "The objection is sustained, unless counsel will state the particular stimuli referred to, whether it be food, drugs, or medicine." Counsel then undertook to question Bollman with respect to the stimuli of named drugs. The examiner sustained an objection to this line of questioning, saying that he thought the doctor had not "qualified * * * as a pharmacologist, hence I will not permit him to be questioned as to the possible effect of drugs upon the human body and upon that of dogs." Counsel called attention to the witness' testimony that the experiments he had performed on dogs are translatable to man and said, "I should think that it would be perfectly proper for me to develop in what types of situations reactions on dogs cannot be translated to man."

The examiner thereupon switched the ground of his adverse ruling from the absence of qualification in the witness to the nature of the experiments, stating that the experiments had not been performed with the use of drugs or medication, but had been essentially surgical in nature. He added "just let the ruling stand."

As already appears, the witness had been broadly qualified as an expert. His experiments on the dogs had been performed with the use of the drugs bromsulfaelin and ether, and possibly others. Many of the studies he had made and which were included in the 166 publications introduced by the Commission apparently dealt with the effect of various drugs on dogs and other animals, including humans. And he had testified on direct as to the effects of drugs on both man and animals, and had given it as his opinion that experiments with drugs on animals are transferable to man.

We think that questions as to the transferability generally of tests on dogs in connection with the working of the liver, and more specifically as to the extent to which these artificial and seemingly bizarre experiments might be regarded as simulating normal constipation in man, were proper subjects for scrutiny and justified a reasonably broad range of exploration on cross-examination. The examiner's rulings would thus seem to have foreclosed inquiry into matters bearing materially on the validity of the experiments.

3. Dr. Lockwood, testifying for the Commission, was a specialist in surgical research at the University of Pennsylvania Medical School and had written many scientific treatises. He treated diseases of the liver, hepatic system, gall bladder, and digestive system. In sum, the recitation of his qualifications was truly formidable, consuming approximately seven pages of the record.

He had at the instance of the Commission supervised and participated in tests made in the University medical hospital the purpose of which was to determine whether Carter's Little Liver Pills, administered to patients from whom total collection of bile had been obtained, would influence the production of bile in respect to volume and cholic acid content. His experiments were performed in the surgical ward of the hospital on twelve patients, all of whom were recuperating from major internal operations. Several of the patients had been suffering from jaundice shortly prior to the experiments, and the gall bladders of all but three had been removed before the collection of bile was begun. The tests entailed the insertion of a T-tube through the sphincter of Oddi into the common bile duct leading from the gall bladder and the liver to the duodenum. The T-tube was connected with a bottle system and a pump, permitting the collection in the bottles of the bile passing through the upper portion of the common duct. The quantity of bile collected varied somewhat from day to day throughout the whole course of the experiments, but the witness thought the variations were without significance. During the process of the collection, and a number of days after it began, doses of Carter's pills were given the patients. The witness gave it as his opinion on the basis of these experiments that the pills in no way influence the output of bile.

On cross-examination counsel for the petitioner undertook to inquire of the witness whether the condition of the experimentees was not abnormal and whether the tube and suction pump inserted in the biliary tract would not hamper the free flow of the bile. He asked whether in a normal individual, without the use of any such apparatus as was employed in the experiments, the common duct and gall bladder and the cystic ducts are not filled with bile most of the time. The witness answered, in effect, that they would be filled or partly so. The examination continued in the manner following:

"Q. At the lower end of the common duct is a sphincter? A. Yes.

"Q. Where the common duct enters the duodenum? A. Yes.

"Q. And as the system requires bile, that sphincter opens and closes into the duodenum from time to time, does it not? A. That is right.

"Q. And when the sphincter closes, there is a back pressure that is built up? A. Yes.

"Q. In the biliary system? A. Yes.

"Q. And does that back pressure have any influence at all on the flow of bile from the liver?"

The latter question was objected to as not being within the scope of the direct examination. The examiner ruled that "the Doctor here has not been qualified by the Commission's attorney as an expert on all of these various phases of the liver and the biliary tract. If you [referring to petitioner's counsel] care to undertake to qualify him, that would be a different matter, but it would seem to me that you are going beyond the scope of the direct examination." Another question along the same line was then asked and objected to, counsel for the Commission stating: "Now if Mr. Hanaway wants to qualify the

Doctor and use him as his witness on that, that is up to him." In sustaining the objection the examiner said: "I do not believe Dr. Lockwood has been qualified as an expert on the liver and biliary tract, for which reason I will uphold the objection, and give you an opportunity, if you care to, to qualify the witness on your own behalf, if you can, * * *." The following then occurred:

"Q. (by Mr. Hanaway) [petitioner's counsel]: Do you understand the operation of the biliary system, Dr. Lockwood?

"Mr. Cohn [for the Commission]: Well, of course he is making him his witness, your Honor.

"Trial Examiner Purcell: I think Mr. Hanaway understands that.

"The Witness: I have a sufficient working knowledge of the function of the biliary tract so that I wouldn't hesitate to treat patients for biliary tract disease.

"Q. (by Mr. Hanaway): Do you think you know enough about the operation of the biliary system under normal conditions to answer my questions concerning it? A. I can answer any question you have asked me so far, yes.

"Mr. Hanaway: May I now proceed with the questioning, Mr. Examiner?

"Trial Examiner Purcell: With the understanding that from this point forward, you have made the witness your own."

At this juncture petitioner's counsel disclaimed any purpose of sponsoring the witness, and upon an attempted resumption of the cross-examination the following occurred:

"Q. [By Mr. Hanaway] There is no mechanism in a normal human being that corresponds to this pump that you have described in Commission's Exhibit 148, is there, Doctor?

"Mr. Cohn: Objection, your Honor.

"Trial Examiner Purcell: Objection sustained.

"Q. (by Mr. Hanaway): Then so far as the presence of the suction is concerned through the common duct and into the biliary system, that condition was abnormal, was it not?

"Mr. Cohn: I object, your Honor.

"Trial Examiner Purcell: Objection sustained."

Little comment seems necessary. Dr. Lockwood himself professed his ability to answer the questions asked. As to his qualifications to do so, his experiments necessarily presupposed an extensive knowledge on his part of the biliary system. Throughout more than 150 pages of direct testimony he had been permitted to describe the intricate surgical experiments performed on the biliary systems of these twelve patients, all of whom were in the hospital for treatment of diseases of the gall bladder and biliary tract. Here, too, the abnormal condition of the experimentees plus the artificiality of the means by which the tests were carried on, suggested at least the possibility that the experiments had little if any value as support for the conclusions drawn from them.

More especially in the case of expert witnesses, cross-examination is of necessity exploratory and should be given broad latitude. Neither counsel nor the judge can know in advance what chinks may be disclosed in the armor of the expert or what frailties revealed in his premises. Cf. Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624. The condition imposed by the examiner that petitioner make this adversary witness his own was flagrant error. As Judge Sanborn remarked in Heard v. United States, 8 Cir., 255 F. 829, 832, "[i]t is no answer to a refusal to permit a full cross-examination that the party against whom the witness is called might have made him his own witness, and might then have proved by him or by some other witness, or by some writing, the facts which the cross-examiner was entitled to draw from the testimony of his adversary's witness. No one is bound to make his adversary's witness

his own to prove facts which he is lawfully entitled to establish by the cross-examination of that witness. The testimony given by a witness on his cross-examination is the evidence of the party in whose behalf he is called and the cross-examiner has the right to bind his adversary by the truth elicited from his own witness."

4. Dr. Case, a Commission witness, testified at length on direct concerning his qualifications. He specialized in radiology, had several degrees, and was a fellow or member of numerous learned bodies including the American and French Societies of Gastroenterology. He had written a four-volume Atlas and text on the digestive tube, and had contributed chapters to various medical books on a variety of subjects. Asked especially what studies and work he had had in gastroenterology, he replied: "All my life I have been especially interested in gastroenterology, and have done a great deal of gastroenterological surgery. I have always been interested in it. My X-ray work, if I have any special interest, has been in the digestive tube, especially gall bladder, stomach and bowel." He had, he said, performed over a thousand gall bladder operations and thought it would be fair to say that he had done about 15,000 tests of the gall bladder by a method of visualizing that organ.

On behalf of the Commission the Doctor undertook an assignment described in the trial examiner's report as the making of "certain experiments with Carter's Little Liver Pills to ascertain what effect said pills had upon the functioning of the liver in the production of bile, and of the gall bladder in the flow, storage, and concentration of bile."

For these experiments the witness had used a number of subjects to whom he administered a dye which would make the gall bladder and certain other parts of the biliary system visible when X-rayed. The subject was then required to eat a carbohydrate meal, all fats and proteins being eliminated. Following this an X-ray picture was taken of the gall bladder, and immediately the subject was given Carter's Liver Pills, and at the end of a few hours he was again X-rayed to see what effect, if any, the pills had had. Afterwards a fat meal was given the subject, and later a third picture taken to see what effect the fat had had on the biliary system. In summarizing the results of the experiments, the witness was questioned on direct and testified as follows:

"Q. Well, based on any of the experiments, Doctor, what is your conclusion as to the results of Carter's Little Liver Pills, first, on the formation of bile by the liver? A. They have no effect on the formation of bile by the liver.

"Q. On the emptying of the gall bladder or causing the gall bladder to throw out bile? A. It has no effect.

"Q. And, third, upon the flow of bile? A. It has no effect.

"Q. Doctor, when I was talking about the 'flow of bile' I mean the flow of bile through the duct and through the sphincter of Oddi into the intestine. You understood that? A. That is the only way it can flow. It can't flow any other way."

On cross, petitioner's counsel sought to inquire of the witness concerning the operation of the liver, gall bladder, and the ducts of the biliary system. Counsel for the Commission objected to the line of questioning as not being proper cross-examination. Petitioner's counsel remarked to the examiner that the questions were "right in line with the long discussion we had last night at the end of which you ruled I might explore into these things as a part of the biliary part of the functioning of the liver and gall bladder." The examiner sustained the Commission's objection saying: "Since my ruling of last night, I have taken occasion to read over Dr. Case's examination in chief in great detail, and I must frankly admit that because of his testimony as to his qualifications, I was misled into thinking that he had been introduced as a gastroenterologist, instead of which a very careful reading of his testimony, from the beginning to the end, discloses that practically every question that was put to him on direct examination

was based upon these pictures which he took as a Roentgenologist."

The examiner at this juncture turned to the witness and propounded a series of highly suggestive questions with the aim, so to speak, of cutting him down to size. At the conclusion he announced that he was going to change his ruling and limit cross-examination of the witness to the X-ray exhibits, "and anything that may properly be asked of him as to his qualifications in radiology, his interpretive readings of the various exhibits, and anything else that may appertain to the exhibits themselves."

Thereupon counsel for petitioner, after stating reasons thought to justify his attempted cross-examination, said:

"Now if your Honor wants to rule that this man is qualified only to describe what appears in those pictures, I am satisfied with that ruling.

"Trial Examiner Purcell: Very well, sir.

"Mr. Hanaway: And I will move to strike out everything else that he said today.

"Trial Examiner Purcell: You mean on cross examination?

"Mr. Hanaway: On direct.

"Trial Examiner Purcell: On direct!

"Mr. Hanaway: Because he went way beyond that.

"Trial Examiner Purcell: Your motion to strike will be denied, and the ruling of the Examiner will stand. Confine your future examination to the pictures."

■ Now clearly it is not permissible for the Commission to qualify and use a witness for its own purposes as one having attainments in the field of gastroenterology, and then reduce him for purposes of cross-examination to the stature of a mere taker and explainer of X-ray pictures. We think that is what was done in this instance. As appears from the record excerpts quoted above, crucial questions put to Dr. Case were not confined to the X-ray exhibits but related generally to the *experiments* the witness had conducted. We agree with petitioner that more was involved in these experiments than a mere series of X-rays. The experiments were of the witness' own devising and were necessarily based on his familiarity with the physiology of the biliary system and the internal organs and on the vast number of cases he had previously examined. They dealt generally with the functioning of the gall bladder and bile and specifically with their functioning in respect of certain foods. In formulating the experiments as well as in interpreting them the witness was obviously required to draw extensively upon his knowledge of physiology and gastroenterology.[3]

■ It is argued that there was ample evidence from other quarters to sustain the findings and order of the Commission, hence the rulings, even if wrong, were not prejudicial. We are of opinion, however, that the cumulative effect of these unjustifiable restrictions on the cross-examination of key witnesses for the Commission was to deprive petitioner of a fair hearing. Such being the case the court is not disposed to speculate as to what would have been the outcome had a fair and impartial hearing been accorded. Inland Steel Co. v. NLRB, 7th Cir., 109 F.2d 9; Empire Oil & Gas Corp. v. United States, 9 Cir., 136 F.2d 868, 871; Willapoint Oysters v. Ewing, 9 Cir., 174 F.2d 676, certiorari denied 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527. Cf. Reilly v. Pinkus, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63.

The order of the Commission is set aside.

---

3. At a later stage of the proceedings petitioner subpenaed Dr. Case and offered to prove by him that he was president of the Battle Creek Food Company, producer and dispenser of a proprietary laxative in competition with petitioner, hence was an interested witness. The examiner rejected the offer on the ground that it came "too late," notwithstanding the case was still open for the taking of evidence.