275 F.2d 699
 Mary L. TAYLOR, Administratrix of the Estate of Marshall H.
Taylor, Jr., deceased, Mildred R. Grover, Administratrix of
the Estate of Elmer E. Grover, deceased, and Watson Brothers
Transportation Company, Inc., Appellants,
v.
REO MOTORS, INC., Appellee.
 No. 6210.
 United States Court of Appeals Tenth Circuit.
 Feb. 10, 1960, Rehearing Denied March 30, 1960.
 
 Emmet A. Blaes, Wichita, Kan. (W.D. Jochems, J. Wirth Sargent, Roetzel Jochems, Robert G. Braden, J. Francis Hesse, James W. Sargent, Jr., Stanley E. Wisdom, Vincent L. Bogart, Cecil E. Merkel, John W. Brimer and Harry L. Hobson, Wichita, Kan., on the brief), for appellants.
 H. E. Jones and Wm. P. Thompson, Wichita, Kan. (A. W. Hershberger, Richard Jones, Jerome E. Jones, Robert J. Roth and William R. Smith, Wichita, Kan., on the brief), for appellee.
 Before MURRAH, Chief Judge, LEWIS, Circuit Judge, and WALLACE, district judge.
 MURRAH, Chief Judge.
 
 
 1
 This is an appeal from a judgment on a jury verdict in these consolidated wrongful death and property damage actions against the manufacturer of a motor-freight tractor, for alleged manufacturing defects in a part of its fuel system. The undisputed facts are that while the propane-fueled Reo truck was moving easterly downgrade on the Denver-Wichita Highway in Kansas, a fire broke out in and about the tractor part of the truck. The cab became engulfed in flames, the truck was turned into a side road, the driver and his helper left the truck, and it plunged forty or fifty feet over a cliff. The driver and his helper were severely burned, causing death, and the tractor and truck were badly damaged. It seems also to be agreed that the destructive fire resulted from the ignition of escaping propane. The salient and disputed issue is the origin and circumstances which caused the propane to become ignited and aflame.
 
 
 2
 The asserted actionable negligence against the manufacturer of the tractor is based upon the theory, supported by expert testimony, that the fire and resulting damage were proximately caused by the malfunctioning of the 'heat exchanger' under the engine hood, which permitted excessive quantities of propane to escape through the air cleaner on top of the carburetor; that the escaping propane was ignited, probably by the backfiring of the engine, and the fire was forced backward by the forward motion of the truck and motor fan through the instrument openings in the fire wall between the engine and the cab; that the cab thus became inflamed and the occupants were burned before leaving it.
 
 
 3
 The heat exchanger is attached to the motor, and its function is to vaporize the liquid propane for power consumption in the combustible engine. The liquid propane comes to the heat exchanger through flexible copper tubes from pressurized fuel tanks located on each side of the tractor below and immediately behind the cab. It is fed into the exchanger through an electrically operated valve called a solenoid, where it is vaporized and expanded as it passes through a hot water heated tube and two regulating valves in the exchanger. It then passes as vapor through a flexible line to the engine carburetor where it is mixed with air by the suction of the engine, drawing it through the manifold system for use by the engine.
 
 
 4
 It was the opinion of appellants' expert, based upon facts of record, that the presence of a round instead of a flat headed nut on the plate and disphragm of the heat exchanger allowed the diaphragm to turn itself in such a way as to open the secondary regulator and allow propane to escape through the air cleaner; that the escaping of such propane tended to accentuate a back pressure at that point and thus maintain a continuous and excessive flow of propane up through the air cleaner. The appellant's expert conducted courtroom experiments in support of his theory of the origin and cause of the fire.
 
 
 5
 On cross examination the expert was asked to make certain computations based upon assumptions not included in his hypothesis, the purpose and intended effect of which was to disprove appellants' theory that the propane escaped through the air cleaner and was ignited there. Appellants objected to the form of the cross examination as not going to the credibility of the witness, or as germane to the issues developed on direct examination. They insist and do now assert that the cross examiner should have been required to make the witness his own in respect to the testimony he sought to elicit. But on cross examination of an expert witness, any 'fact germane to the inquiry, whether testified to or not, may, in the sound discretion of the court, be used for testing the expert.' Livingstone v. City of New Haven,125 Conn. 123, 3 A.2d 836, 838, cited in Wigmore on Evidence, 3rd Ed., 1957 Supp., 684. The cross examiner is not limited to his adversary's hypothesis. He may also hypothesize for the purpose of testing the skill, learning or accuracy of the expert, or to test the reasonableness of his opinion, provided of course that the hypothesis is founded in fact and is germane to the inquiry. Carter Products, Inc. v. Federal Trade Commission, 9 Cir., 201 F.2d 446. The computations which the expert witness was asked to make were based upon factual assumptions. They were relevant to the inquiry and certainly were not reversibly erroneous.
 
 
 6
 In support of the appellee's theory of the origin and cause of the fire, one lay witness testified that as he approached the Reo truck traveling in an opposite direction, he noticed a cloud of white smoke coming both from around the side and back of the cab; that as he passed the truck he heard a 'hissing notise as the truck he heard a 'hissing noise as as if it was an air leak or something'; that when about a quarter of a mile away he heard a noise, and checking through his rear mirror, saw a flame coming from the driver's side of the truck.
 
 
 7
 An attending nurse at the hospital where driver Taylor and his helper Grover were taken for treatment, testified that Taylor told her that the tank was 'popping off and that the truck then backfired.' This testimony was strenuously objected to as privileged, and its admission is assigned as reversible error on the grounds that it comes within the Kansas statute which renders a physician or surgeon incompetent to testify concerning 'any communication made to him by his patient with reference to any physical or supposed physical disease, defect, or injury, or the time, manner or circumstances under which the ailment was incurred * * *.' G.S.Kan.1949, 60-2805, subd. 6. This statute is said to embrace a nurse in attendance at the time such communications are made to the physician, else the statute would be ineffectual, citing Wolfle v. United States, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617. And see also Annotation 47 A.L.R.2d 749.
 
 
 8
 Under Rule 43, F.R.Civ.P., 28 U.S.C.A., governing the admissibility of evidence in civil trials in federal court, 'all evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held'; and the statute or rule which favors the reception of the evidence governs. Cf. Rule 26 F.R.Crim.P., 18 U.S.C.A. Of course if the nurse was incompetent to testify under the statute relating to physicians, her testimony would be inadmissible under the applicable rules of evidence in the State of Kansas, and we know of no federal statute or evidential rule of equity which would make her testimony otherwise admissible.
 
 
 9
 The Kansas courts have not spoken on the divided question whether an attending nurse comes within the statutory privilege expressly applicable to physicians. One well considered view is that such statute should not be construed to extend the privilege to an attending nurse on the grounds that since the statute excludes otherwise admissible testimony, it should be limited by its terms to persons named therein, i.e., physicians and surgeons. See Southwest Metals Co. v. Gomez, 9 Cir., 4 F.2d 215, 39 A.L.R. 1416. And see also Annotation 47 A.L.R.2d 742, Subtopic III. But even though the statute be construed to include attending nurses, the Kansas courts have construed the statutory privilege as pertaining to 'matters germane to the physician's diagnosis and treatment of the patient.' See Smith's Estate v. Davis, 168 Kan. 210, 212 P.2d 322, 328. And there is nothing in this record to indicate that the statement sought to be excluded was germane to the diagnosis or treatment of the patient. And moreover, there is nothing to indicate that the statement was made in confidence or was intended to be so treated. It was simply a death bed statement, apparently made to anyone who happened to be listening, and it was not privileged. Cf. Wilcoxon v. United States, 10 Cir., 231 F.2d 384.
 
 
 10
 The defendant-appellee introduced expert testimony tending to disprove the plaintiff-appellant's theory of the cause of the fire, and to discredit the courtroom experiments in support thereof. And, its expert was permitted to testify in response to a hypothetical question that in his opinion, the sun shining on the propane fuel tanks immediately below and behind the cab caused the propane to heat, expand and pop off through valves thereon, and that this escaping vapor formed a cloud in and about the cab, which was ignited by the backfiring of the engine through the exhaust. The testimony of the witness was objected to and its admission is assigned as error on the grounds that the hypothetical question on which he based his opinion did not assume all of the relevant facts, and was therefore inadmissible. The appellants particularly complain of the failure of the hypothetical question to include clude the fact that the greatest intensity of the heat was shown to be under the hood of the engine, not in and about the fuel tanks; and the further fact that the fuel tanks were shown to be only about sixty per cent full at the time of the explosion. On cross examination, the witness suggested that the fire in the engine compartment and fire wall probably occurred after, rather than before, the truck crashed. It seems to be agreed that the fuel tanks were only sixty to sixty-five per cent full after the wreck. But the defendant's expert witness did not think that the degree of fullness necessarily affected the amount of pressure that would be generated by the suction on the tanks, and the 'rising temperature of the liquid.' He further stated that his opinion concerning the heat and pressure sure which probably caused the popping off was based upon his experience and related information obtained 'more or less as the years have gone on.'
 
 
 11
 We have said that 'a hypothetical question should incorporate facts supported by evidence, but need not include all the facts in evidence nor facts or theories advanced by the adversary. If the adversary desires the opinion of the expert upon the facts as he asserts them to be, he can obtain it on cross-examination * * *.' New York Life Ins. Co. v. Doerksen, 10 Cir.,75 F.2d 96, 102. The facts assumed by the defendant's expert witness, and which formed the factual basis for his conclusions, were not so completely ill founded as to distort the true facts and mislead the jury. In the last analysis, these questions must be left largely to the discretion of the trial court, and we cannot say that the court abused its discretion in permitting the conclusions of the expert to go to the jury. See Wigmore on Evidence, 3rd Ed., 682.
 
 
 12
 The appellants contend that the verdict of the jury was contrary to the overwhelming weight of evidence in the case, and that the trial court abused its discretion in refusing to grant a new trial. They contend that in any event, the court should have granted a new trial upon newly discovered evidence, disclosed by post-trial experiments conducted by appellants' expert, which is claimed to completely disprove the defendant's theory of the case as advanced by its expert. But we think the court was well within its wide latitude of discretion in refusing to grant a new trial for either reason. As we have seen, both parties advanced divergent theories concerning the origin and cause of the fire which caused the damage. Both parties supported their theories with the testimony of experts whose opinions we have said were competent and were submitted to the jury. The jury apparently rejected the plaintiffs' theory and accepted the defendant's, or chose not to believe either. In any event, the evidence presented a jury question and the newly discovered evidence developed by further experimentation related to the appellee's theory of the cause of the fire. And, there is nothing to indicate that it was not obtainable during the trial of the case. Indeed, it appears to be merely accumulative of evidence which was already before the jury.
 
 
 13
 The court instructed the jury abstractly to the effect that if the manufacturer of the motor vehicle in question bought a heat exchanger of an approved design and standard quality from a reputable and experienced manufacturer of such parts, the vehicle manufacturer is only under a duty of reasonable care to ascertain by proper and reasonable test whether the part is apparently adequate for the purpose for which it was made. The appellants objected to this instruction on the grounds that no such defense was pleaded, and furthermore, that in the pre-trial conference, the defendant was asked to and did delineate the exact nature of its defense, and did not state or mention the defense posed by this instruction; that proffered testimony on this point was in fact excluded by the ruling of the court; and that the plaintiffs were not prepared to meet any such defense and would have produced additional testimony if it had been properly raised in the case. The defense is said to be an affirmative one under Rule 8(c) F.R.Civ.P., and that by failure to affirmatively allege it, the defendant waived it under Rule 12(h) F.R.Civ.P.
 
 
 14
 It is of course true, despite the simplicity of pleading requirements under Rule 8(c), that defense by avoidance must be affirmatively pleaded. See Zeligson v. Hartman-Blair, Inc., 10 Cir., 135 F.2d 874. The purpose of this requirement is to give fair notice of defensive matter in order to avoid surprise. But even so, the pre-trial conference, after utilization of discovery, is the proper time and place for settling the triable issues in the case. It is the appropriate time and place for the parties to state the grounds upon which they expect to prevail in the lawsuit. And, once triable issues are thus agreed upon, they ought not be altered or modified except to prevent manifest injustice. When, at the pre-trial conference in this case, counsel for the appellee was asked by the court to state his theory of the case, he answer forthrightly that the 'real cause of this particular occurrence is the lack of a connection between the relief valves on the saddle tank and a stack which would have carried vapors away and above the truck, and a backfiring of the vehicle at the same time as a relief of those tanks * * *.' When counsel was asked if there was 'anything else,' he stated that 'if our experts advise us that there is some other possible cause for this particular occurrence, I shall advise Mr. Blaes.' In the trial of the case, a witness for the defendant testified that the heat exchanger was manufactured by the American Liquid Gas Corporation, and that it was an early producer of this type of equipment. He was then asked if he knew the reputation of the manufacturer with respect to this product. The appellants objected to the answer as being irrelevant to any issue in the case, the defendant not having pleaded any such defense. The court sustained this objection and the matter was not pursued further.
 
 
 15
 From this, it seems manifestly plain that the defense of reliance upon a reputable manufacturer of the heat exchanger was first injected in the lawsuit with the trial court's instructions in that regard. We think this issue was defensive matter which, if not affirmatively pleaded, certainly should have been disclosed in the pre-trial conference, or at some other stage of the proceedings, short of the instructions to the jury. Moreover, the trial court having excluded the testimony concerning the reputation of the manufacturer of the heat exchanger as irrelevant to the issue, an instruction on the point was improper and tended to confuse and distort the triable issues in the case. It injected an element of surprise in the lawsuit contrary to modern concepts of trial practice contemplated under F.R.Civ.P. It tended to perpetuate the idea that a lawsuit is a game of chance rather than an open resolution of the issues agreed upon prior to trial. We think the instruction was improper and prejudicial.
 
 
 16
 The trial court also gave an instruction to the jury which permitted them to find that decedent Grover was contributorily negligent, barring recovery. His Administratrix complains of this instruction on the grounds that there was no evidence from which the jury could reasonably find that Grover was guilty of any contributory negligence whatsoever. When the issues were being made up at the pre-trial conference, attorneys for the appellee were pressed to state in what respect Grover was guilty of contributory negligence. Counsel was unable to state any acts of contributory negligence at the time and promised to give them to counsel if further investigation revealed them. Nothing further was stated with respect thereto, and there is no evidence in this case of any acts which can be construed as contributory negligence. None is suggested other than that Grover made two trips in the truck after modifications by Taylor relied upon by the defendant as acts of contributory negligence. It may be that Grover assumed the risk of his employment by voluntarily exposing himself to appreciated danger. But there is no suggestion of that defense in this case. We think it was error to submit the question of contributory negligence to the jury.
 
 
 17
 Although the appellant did not object to the instruction on contributory negligence of driver Taylor, it seems appropriate to observe that there was no evidence whatsoever of Taylor's contributory negligence with respect to his theory of primary negligence. The case was submitted to the jury on counter theories as to the cause of the fire. There was no claim that Taylor or Grover were in any way responsible if the fire was caused by the defective heat exchanger. The only claim of contributory negligence was in respect to the defendant's theory of the cause of the fire. And while Taylor's modifications in the installation of a relief driver's compartment may have had a causal relationship, the defense would obviously be one of proximate cause, not contributory negligence.
 
 
 18
 Finally, complaint is made of misconduct of the jury, and since in our view, the case must be retried, it seems appropriate to comment on this assignment of error. According to the affidavit of one of the jurors, the heat exchanger was taken to the jury room as an exhibit, and while the jury was deliberating, the device was dismantled and reassembled by members of the jury by the use of pocket knives, nail clippers and other pocket tools belonging to members of the jury. The salient question is whether the experiment or investigation made by the jury out of the presence of the parties, and while they were deliberating, can be said to be within the scope or purview of the evidence introduced at the trial, or whether it amounts to the taking of evidence outside the presence of the parties. See Annotation 80 A.L.R. 108. If the experiment or demonstration was conducted by the jury for the purpose of testing the truth of the statements made concerning the functioning of the heat exchanger, it was proper. The heat exchanger was offered in evidence. It had been disassembled and reassembled in open court by experts for the purpose of demonstrating negligence or lack of negligence in its manufacture or assemblage. The exhibit was before the jury, and it was permissible to take it to the jury room and examine it for the purpose of testing the validity of statements made in open court in respect thereto. If it had been a written document in fine print, we do not suppose that it would have been improper for the jury to use a magnifying glass in possession of one of them for the purpose of scrutinizing critical language. It therefore does not seem improper for the jury to disassemble this exhibit for the purpose of deciding the issues presented to them.
 
 
 19
 The judgment is reversed and the case is remanded for new trial in accordance with the views herein expressed.