**Veronica BOWLIN, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–3677.**

Court of Appeals of Alaska.

Dec. 27, 1991.

Cynthia Drinkwater, Asst. Public Defender, Palmer, and John B. Salemi, Public Defender, Anchorage, for appellant.

Eugene B. Cyrus, Asst. Dist. Atty., Kenneth J. Goldman, Dist. Atty., Palmer, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

### OPINION

MANNHEIMER, Judge.

Veronica Bowlin was convicted of refusal to submit to a breath test, AS 28.35.031(a) and AS 28.35.032(f), following a jury trial in the district court at Palmer. The main issue at trial was whether Bowlin, who has asthma, was physically capable of blowing enough air into the Intoximeter machine to trigger the mechanism and run the breath test. The State's theory of the case was that Bowlin had willfully refused to blow enough air into the machine to activate the

test. Bowlin testified that she had tried several times to activate the Intoximeter but, because of her asthma, she had failed despite her best efforts.

■ The prosecutor asked the trial judge to allow the jurors to take turns blowing into the Intoximeter so they could gain personal knowledge of how forceful the flow of air must be to trigger the testing mechanism. District Court Judge Peter Ashman granted the State's motion; the judge, the attorneys, Bowlin, and the jurors went together to the Palmer police station, where the jurors took turns blowing into the Intoximeter and observing how much air was required to activate the machine's testing mechanism. On appeal, Bowlin challenges the district court's decision to allow the jurors to do this.

The procedure adopted by the trial judge in Bowlin's case combines three traditional court procedures: (1) a jury view (having the jury leave the courtroom to inspect physical evidence that cannot practicably be brought to court)[1]; (2) a demonstration (having the jury observe the working of the Intoximeter machine); and (3) an experiment (testing the Intoximeter to see what amount of force was required to fill the testing chamber with enough air to trigger the machine's breath testing function). Moreover, because the jurors themselves blew into the Intoximeter (rather than watching someone else do it), Bowlin's case is also similar to cases involving jury experiments conducted upon or using items of physical evidence during deliberations.

Bowlin points out that the jurors' manipulation and testing of the Intoximeter differed significantly from a normal "jury view" in which jurors merely look at something. See Alaska Criminal Rule 27(b) and Alaska Civil Rule 48(c). She asserts that when the jurors took turns blowing into the Intoximeter they created "new evidence"—evidence obtained outside of court, evidence that Bowlin could not subject to confrontation or cross-examination.

But the words "new evidence" are not a talisman to charm a decision from the facts of this case. "Evidence" is not confined to the sworn words of witnesses or to small objects that can be easily handled, carried into the jury room, and placed in an envelope or box for transmission to an appellate court. Rather, any jury view and any physical demonstration will yield "evidence".

Bowlin cites *State v. Fricks*, 588 P.2d 1328, 1334 (Wash.1979), for the proposition that the sole purpose of a jury view is to help the jury understand testimony already presented in court, and that a jury view is improper if it produces "new" evidence—that is, evidence which is not merely illustrative of witnesses' testimony. Many cases echo the *Fricks* rule. But this distinction between juror observations and the more usual forms of evidence heard in a courtroom does not make sense. *McCormick on Evidence* notes that this limitation on jury views is "uniformly condemned" by commentators on the law of evidence:

This doctrine undoubtedly rests in large part upon the consideration that facts garnered by the jury from a view are difficult or impossible to embody in the written record, thus rendering review of questions concerning weight or sufficiency of the evidence impracticable. At the same time, however, this doctrine ignores the fact that many other varieties of demonstrative evidence are to some extent subject to the same difficulty, and further it is unreasonable to assume that jurors, however they may be instructed, will apply the metaphysical distinction suggested and ignore the evidence of their own senses when it conflicts with the testimony of the witnesses.

*McCormick on Evidence* (2nd ed. 1972), § 216, p. 539. *Accord, Wigmore on Evidence* (Chadbourn rev. 1972), § 1168, Vol. 4, pp. 385–391. Thus, it is the fulfillment of purpose, not the creation of error, when the jury's observation of an intersection, a building, or a machine provides new information that allows the jury to better assess

---

**1.** Apparently, the trial judge decided to bring the jury to the Intoximeter rather than vice-versa because physical removal of the Intoximeter from its location at the police station jeopardizes its certification by the Department of Health and Social Services.

the credibility of witnesses and the weight to be given their testimony.

During the jury's visit to the police station, the jurors observed the working of the Intoximeter machine. In particular, they tested the machine to see how much air flow would trigger it. Demonstrating the working of machinery is an accepted part of evidence. As *Wigmore* pointedly states:

> In general, when a question arises whether at a certain machine, house, field, mine, or other thing, a certain act can be done under given conditions of time, strength, skill, or achievement, one way [to obtain the answer] is to speculate about it, and another way is to try it; and it is a crude error to suppose that the law of evidence here prefers speculation to experience, abhors actual experiment, and delights in guesswork.

*Wigmore* (Chadbourn rev.1979), § 460, Vol. 2, p. 592.

■ Bowlin argues that, if the jury's visit to and operation of the Intoximeter led to the jury's obtaining more evidence, then that visit violated the fundamental rule of trial procedure prohibiting the reception of evidence by the jury outside of court. *Wigmore* (Chadbourn rev.1976), § 1802, Vol. 6, p. 334. But, for purposes of this rule, "court" means the presence of the judge, the jury, and the parties. When a physical object cannot practicably be brought to the courtroom, or when a demonstration cannot feasibly be performed in the courtroom, a trial judge has the discretion to bring the court to the evidence. *Id.* at 336–38; *Wigmore* (Chadbourn rev.1972), § 1162, Vol. 4, p. 362. In Bowlin's case, the judge, the attorneys, and Bowlin herself accompanied the jury to the police station and were present during the entire procedure.

The propriety both of jury views and of courtroom demonstrations is unquestionable. This being so, there is no objection in principle to a combination of the two—the holding of a demonstration in the presence of the jury outside the courtroom. *See Wigmore* (Chadbourn rev.1976), § 1802, Vol. 6, pp. 336–38, indicating that it is proper for a court to hold proceedings at the site of a jury view and have witnesses testify there if this will aid the witnesses in imparting their information and the jury in understanding it.

Bowlin contends, however, that it was error to allow the jurors themselves to participate in the demonstration of the Intoximeter. As noted above, the jurors took turns blowing into the machine and finding out how much breath was required to trigger the testing mechanism. Bowlin argues that this procedure turned each of the jurors into a new "witness" against her, a witness who could not be confronted or cross-examined.

We do not believe that the performance of the Intoximeter test deprived Bowlin of the right to confront the evidence against her. The jurors were not allowed to take the Intoximeter and tinker with it in private; rather, they were given access to the machine at the police station to conduct one specific type of examination (blowing into the machine). The entire procedure occurred in the presence of both Bowlin's attorney and Bowlin herself. Bowlin was able to observe how the procedure was conducted, and the same Intoximeter machine employed in that procedure was available for Bowlin's inspection and testing.

Nor is cross-examination an issue here. Normally, jurors rely upon human witnesses' descriptions of what happened; cross-examination is a method for testing the truthfulness and accuracy of these after-the-fact accounts. But when the jurors blew into the Intoximeter to see what amount of air pressure was needed to trigger the testing mechanism, the jurors were able to directly perceive the result for themselves rather than depending on someone else's account of it. *See Wigmore*, (Chadbourn rev.1976), § 1803, Vol. 6, p. 342.

The Alaska Supreme Court has recognized that a defendant has a due process right, analogous to the right of cross-examination, to test the reliability of the results of the government's chemical analysis of a motorist's breath. *Lauderdale v. State*, 548 P.2d 376 (Alaska 1976). But the scientific test conducted in *Lauderdale* occurred

outside the presence of the jury, and the jury was not in a position to directly assess or gauge the accuracy of the breath test reading. In Bowlin's case, on the other hand, the question is not whether chemical analysis has yielded a trustworthy result. Rather, the issue concerns a physical characteristic of the breath test machine itself: how much breath is required to trigger the machine's testing mechanism. This is a question that can be resolved through the jurors' direct experience, similar to the question of how much the machine weighs or whether it becomes warm to the touch when it is being operated.

Nevertheless, Bowlin's argument is not trivial. As demonstrated by the cases involving juror manipulation and testing of physical evidence during jury deliberations, courts are often troubled when jurors, supplementing their usual role as mere hearers and observers of testimonial and demonstrative evidence, undertake more direct participation in the fact-finding process by examining or probing the physical objects introduced at trial.

Notwithstanding this judicial trepidation, there are many cases upholding jury experimentation with physical evidence. In *People v. Kurena*, 87 Ill.App.3d 771, 43 Ill.Dec. 277, 410 N.E.2d 277 (1980), jurors constructed a cardboard replica of the knife admitted into evidence and used this replica to re-enact the assault, to see if the victim's wounds could have been inflicted by a left-handed or right-handed person, and to see if the weapon could have been concealed in a sleeve. In *State v. Thompson*, 164 Mont. 415, 524 P.2d 1115 (1974), jurors used the handgun admitted into evidence to re-enact the struggle described in the testimony and see if the gun could have been fired if held in the manner described in the testimony. In *Allen v. State*, 141 Tex.Crim. 94, 146 S.W.2d 384, 386 (1940), overruled on another point by *Stiles v. State*, 520 S.W.2d 894 (Tex.Crim.App.1975), the jury experimented with the pistol admitted into evidence to see if, as claimed by the defendant, the cylinder would "hang" or stick at a particular place in its revolution and cause the handgun to discharge accidentally. In *State v. Best*, 89 S.D. 227, 232 N.W.2d 447,

457 (1975), a defendant on trial for child abuse claimed that her infant's injuries had been inflicted when the baby's two-year-old brother had struck the baby with a telephone. The jurors experimented with the telephone (which had been admitted into evidence), testing its weight to see if it was conceivable that a two-year-old could have used it to inflict serious injury. In *People v. Engler*, 150 A.D.2d 827, 540 N.Y.S.2d 591, 594 (N.Y.App.1989), jurors experimented with a vaporizer to test the defendant's claim that a child's injuries had been sustained when the child carelessly played near the vaporizer. In perhaps the most extensive jury experiment, the jurors in *Taylor v. Reo Motors, Inc.*, 275 F.2d 699, 705 (10th Cir.1960), actually dismantled a heat exchanger to test a witness's testimony about the way it functioned.

We list these cases, not to indicate that we necessarily approve of each of these decisions, but to illustrate how much scope courts have been willing to grant juries who experiment with exhibits in the privacy of their deliberations. Bowlin's case is far easier to decide because the procedure at issue in Bowlin's case does not raise the same policy concerns as experimentation that occurs during jury deliberations.

The courts which forbid jurors' manipulation of or experimentation with physical evidence generally base their decisions on one or both of two objections. First, courts object because jury deliberation occurs outside the presence of the parties; thus, the parties cannot point out the weaknesses or possible ambiguities in the jury's mode of examination, nor can they elucidate any lack of similarity between what the jury is doing with the exhibit and how the exhibit was actually used under the circumstances of the case. Second, courts object because they cannot exercise their normal power to exclude a physical demonstration with or experiment upon an object when the current condition of the object differs materially from its condition at the time at issue in the litigation. *See, e.g., People v. Andrew*, 156 A.D.2d 978, 549 N.Y.S.2d 268 (N.Y.App.1989).

The first objection has no force here because the jurors' experiment with the Intoximeter occurred in the presence and under the scrutiny of Bowlin and her attorney. Likewise, the second objection does not apply to Bowlin's case either. Judge Ashman heard the parties argue the pros and cons of holding such an experiment before he exercised his discretion in favor of allowing the procedure. If Bowlin had believed that the current condition of the Intoximeter differed materially from its condition at the time of her arrest, she could have raised this objection.

Finally, Bowlin argues that the jurors' testing of the Intoximeter differed substantially from the event being litigated—Bowlin's act of blowing into the machine at the time of her arrest. Bowlin asserts that, because she has asthma while the jurors do not, the jurors would have found it significantly easier to activate the Intoximeter than she did. Bowlin therefore claims that the jurors' experience with the machine was misleading.

Bowlin's argument misapprehends the purpose of the jurors' test. The jurors were not attempting to duplicate Bowlin's act of blowing into the Intoximeter. Rather, they were attempting to gain a better understanding of the witnesses' testimony by testing a physical characteristic of the Intoximeter, seeing how much air pressure was needed to activate the machine. This is similar to jury tests of the weight or working of a mechanical object upheld in *Allen v. State*, 146 S.W.2d at 386 (alleged defect in the cylinder of a revolver), *State v. Best*, 232 N.W.2d at 457 (weight of a telephone), *People v. Engler*, 540 N.Y.S.2d at 594 (functioning of a vaporizer), and *Taylor v. Reo Motors, Inc.*, 275 F.2d at 705 (functioning of a heat exchanger).

When the jurors tested the Intoximeter, they were already aware that Bowlin had asthma and that Bowlin's medical condition gave her a reduced ability to exhale forcefully. It was clear that the jurors could not duplicate Bowlin's act of blowing into the machine; it was equally clear that the jurors' ability to activate the machine did not necessarily mean that Bowlin could have done so too. Bowlin's attorney had the opportunity to emphasize these two propositions when the case was argued.

For these reasons, we conclude that Judge Ashman did not abuse his discretion when he allowed the jurors in Bowlin's case to go to the Palmer police station and blow into the Intoximeter. The judgement of the district court is AFFIRMED.