STATE of Alaska, Appellant,

v.

Kevin W. PEASE, Appellee.

No. A–8905.

Court of Appeals of Alaska.

July 27, 2007.

W.H. Hawley Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellant.

Lori M. Bodwell, Fairbanks, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Following a jury trial, Kevin W. Pease and Marvin L. Roberts were convicted of robbing and murdering a teenage boy, and also assaulting an adult, Franklin Dayton, in a separate incident that same night. A more detailed description of these events is contained in *Pease v. State*, 54 P.3d 316, 319–321 (Alaska App.2002)—the opinion in which we affirmed Pease's and Roberts's convictions.[1]

About six months after this Court affirmed Pease's and Roberts's convictions, two journalism students from the University of Alaska Fairbanks reported that the jurors had engaged in a group experiment during their deliberations. Further investigation revealed the details of this experiment: During the jury deliberations, the jurors asked the bailiff to take them outside to the northwest corner of the Anchorage courthouse (the corner of Third Avenue and I Street). Two of the jurors then crossed to the north side of Third Avenue and walked west to the location formerly occupied by the Elevation 92 restaurant—that is, to a point a few yards west of the intersection of Third Avenue and K Street, approximately 430 feet from the other jurors. So positioned, the two groups of jurors looked at each other across this distance to see if they could recognize each other. (The significance of this experiment will be explained shortly.)

Having learned all this, Pease filed a petition for post-conviction relief, arguing that he was entitled to a new trial because the jurors

---

1. Four men actually perpetrated these crimes. We affirmed the convictions of the other two accomplices in *Vent v. State*, 67 P.3d 661 (Alaska App.2003), and *Frese v. State*, Alaska App. Memorandum Opinion No. 4629 (October 23, 2002), 2002 WL 31376010.

conducted this unauthorized visual experiment. The superior court ultimately agreed. Relying on this Court's decision in *Gorz v. State*, 749 P.2d 1349, 1355 (Alaska App.1988), Superior Court Judge Ben J. Esch concluded that the jurors committed misconduct when they performed this experiment, and that the result of this experiment had probably influenced the jury's verdict. Judge Esch therefore granted Pease's petition for post-conviction relief and ordered a new trial.

We conclude that the superior court erred in ordering a new trial. Our conclusion is based on a three-part analysis.

We conclude that the jurors could properly conduct this type of experiment, and that there would have been no error if the experiment had been conducted within the confines of the jury room.

We further conclude that the jurors committed misconduct when they failed to seek court permission to leave the jury room and go outside to perform the experiment. But not all acts of jury misconduct require a new trial.

Here, the jurors' act of going outside to conduct the experiment did not make the results of their experiment less reliable or valid. Indeed, as we explain here, conducting the experiment outside helped make the results more reliable and valid.

Thus, because the jurors were entitled to conduct this type of experiment in the first place, we conclude that the fact that this experiment took place outside did not prejudice the fairness of Pease's trial.

*Underlying facts*

One of the important government witnesses at trial was Arlo Olson, who testified that he saw Pease, Roberts, and two other accomplices (Eugene Vent and George Frese) commit an assault upon Franklin Dayton down the street from the Eagles Hall in Fairbanks.

Olson was attending a late-evening wedding reception at the Eagles Hall. According to his testimony, he was standing on the front steps of the hall between 12:30 and 1:00 in the morning when Pease, Roberts, and the two other men drove up in Roberts's car.

Olson was not well-acquainted with Pease and Roberts, but Olson had known one of the other men, Eugene Vent, since high school, and Olson was friends with the fourth man, George Frese. Frese asked Olson if he wanted to get high with them, but Olson declined, so the four men drove off.

Olson testified that, about half an hour later, while he was still on the front steps of the Eagles Hall, he saw the four men attack Franklin Dayton as Dayton walked down the street. Olson testified that he saw Pease push Dayton to the ground, and then all four men began kicking Dayton. When one of the four men yelled, "Give me your fucking money, bitch," Dayton handed something to one of the four. The four men then ran to Roberts's car and drove away.

Pease's defense was alibi; he claimed to have been elsewhere that night. Accordingly, Pease's attorney attacked Olson's identification of Pease as one of the assailants.

Part of this attack took the form of cross-examination. Olson admitted that he had drunk a considerable quantity of alcoholic beverages on the evening in question, and he further admitted that he had smoked marijuana earlier in the day. Moreover, Olson admitted that the attack on Dayton had lasted only about thirty seconds, and that the four assailants had had their backs to Olson for much of this time. Olson conceded that he did not get a good look at the four men until they were running back to their car.

The defense also introduced expert testimony to attack Olson's identification of Pease. Olson testified that he observed the attack on Dayton from about 400 feet away. To rebut Olson's testimony that he could identify the four assailants from a distance of 400 feet, the defense presented Dr. Geoffrey Loftus, an expert on human visual perception and memory. Dr. Loftus testified that it was virtually impossible for a human being to distinguish one person from another at that distance—indeed, at even half that distance.

According to Dr. Loftus, "[the] ability to distinguish [any one person] from somebody else—in other words, to recognize them later on—is essentially nil" beyond 200 feet. Lof-

tus claimed that this was true even when under the best of circumstances—that is, even when the lighting is good, and the observer has "unlimited time" to make the observation, and when the observer is "in an optimal physiological state" to make the observation ("awake, alert, [and] not ill, ... drunk, [or] under the influence of any drugs").

This dispute as to whether Arlo Olson's identification of Pease was humanly possible figured prominently in the summations delivered by the prosecutor and the defense attorneys at the close of the trial. As Judge Esch noted in his decision, "all counsel discussed the testimony of these two witnesses and attempted to [either] bolster or denigrate its value."

During their deliberations, the jurors attempted to test this issue by looking out of the jury room window to see if they could recognize people at a distance. (The jury room windows in the Anchorage courthouse face north; these windows overlook city streets, a parking lot, and (farther in the distance) portions of the Alaska Railroad yard and the Port of Anchorage.) However, this effort to discern people's features at a distance through the jury room window proved unfruitful because the jurors had differing estimates concerning how far away a particular observed person was. To better investigate this issue, the jurors decided to go outside and view each other across a distance that could be paced off.

It was in this context that the jurors left the courthouse and conducted their experiment. Apparently, the experiment had mixed results: at least six of the jurors indicated that they were able to recognize each other across this distance, but at least one juror acknowledged that he could not.

In Pease's petition for post-conviction relief, he characterized the jurors' experiment as an attempt to assess the credibility of a key government witness, Arlo Olson. But as Judge Esch recognized, the circumstances of the jurors' experiment show that the experiment was only peripherally relevant to assessing the credibility of Olson's testimony.

As explained above, Olson had been drinking, and he made his observations in the middle of the night (in October, when it was dark). The jurors made no attempt to replicate these conditions, even though these factors were obviously important to assessing the trustworthiness of Olson's identification. Rather, based on the circumstances of the experiment and the jurors' accounts of their actions, Judge Esch found that the primary purpose of their experiment "was ... to test the validity of Loftus'[s] testimony". That is, the main purpose of the experiment was to test Loftus's assertion that it was not humanly possible, even under the best conditions, to recognize another person at a distance of greater than 200 feet.

*Cases upholding the authority of a jury to engage in experimentation to test the factual assertions made by witnesses or the theories suggested by the attorneys*

Centuries ago, the role of the jury was to investigate allegations of criminal behavior and then render a decision based on their investigation.[2] In modern times, however, the parties—that is, the government and the defendant—are in charge of investigating and presenting the facts of the case (with the trial judge having a residual authority to call additional witnesses and to cross-examine the witnesses presented by the parties).[3]

Because the jury no longer has a formal investigative role, courts often declare that juries are required to base their decisions solely on the evidence presented in court,

---

**2.** *See* Wayne R. LaFave, Jerold H. Israel, and Nancy J. King, *Criminal Procedure* (2nd ed.1999), § 1.4(c), Vol. 1, p. 177 n. 113:

When the Normans introduced the jury [to English law], they ... sought merely to gain the advantage of community knowledge of local events. As first established, jurors were neighbors who were likely to know something of the facts in question. They typically based their verdicts on their own knowledge and what they heard from their friends. As England moved from a rural to a more urbanized society, it was no longer possible to assume that jurors were self-informed. A method [was then] developed for presenting the facts to the jury in the course of the trial.

**3.** *See* Alaska Evidence Rule 614 ("Calling and Examination of Witnesses by [the] Court").

and that juries are barred from independently investigating the case or from otherwise considering extraneous information (*i.e.*, information that was not elicited during the trial).[4] Here, for example, is what this Court said on this subject in *Gorz v. State:*

> The law [on this point] is well settled. Jurors have a duty to consider only the evidence presented in open court.... Evidence that has not been subjected to the procedural safeguards of trial impinges on the constitutional rights to confrontation, cross-examination, and counsel.

*Gorz,* 749 P.2d 1349, 1355 (Alaska App.1988).

But this is an over-simplification. The law does, in fact, sometimes allow jurors to rely on information that was obtained outside of the court proceedings.

The Alaska Supreme Court has held that jurors are allowed to discuss, and to rely on, any "pre-existing ... knowledge of a general nature" that individual jurors bring to the deliberative process. *Titus v. State,* 963 P.2d 258, 262 (Alaska 1998).

For example, in *Titus,* the supreme court approvingly cited a case where, during deliberations, an individual juror shared his expertise in X-ray technology. *Id.* at 262.[5] And, employing the *Titus* rule, this Court held that it was not misconduct for individual jurors to share their personal knowledge of how loud a shot from a .22 caliber rifle would be, or their knowledge of the breakage characteristics of the type of glass used in construction vehicles. *See Larson v. State,* 79 P.3d 650, 654 (Alaska App.2003).

See also *Brooks v. Zahn,* 170 Ariz. 545, 826 P.2d 1171, 1176–78 (Ariz.App.1991), where one of the jurors was a registered nurse who relied upon her medical knowledge and experience during the jury's deliberations. The Arizona court held that the juror's prior knowledge was not "extraneous". Similarly, in *State v. Aguilar,* 169 Ariz. 180, 818 P.2d 165 (Ariz.App.1991), one of the jurors was a medical doctor. He "shared with the other jurors [his] fund of knowledge ... regarding alcohol and cocaine ... blackouts", and he also told the other jurors that he disagreed with the defendant's expert witness who had testified that the defendant lacked criminal intent because of his alcohol and cocaine consumption. *Id.* at 166–67. The Arizona court held that the doctor's knowledge was not "extraneous" information.

As can be seen from these examples, a juror's personal knowledge of such topics may be quite important, even crucial, in evaluating the credibility or plausibility of the testimony presented during the trial. Nevertheless, this juror knowledge is not considered "extraneous" information, even though it is obtained extrajudicially. It is not misconduct for jurors to share this information with each other, nor is it misconduct for the jurors to rely on this information during their deliberations. *Titus,* 963 P.2d at 262.

There is another line of authority, more pertinent to Pease's case, that addresses the issue of jury experimentation during deliberations. Courts have repeatedly upheld jurors' efforts to test the credibility or plausibility of trial testimony by experimenting with items of physical evidence admitted during the trial, or by re-enacting the events or conditions described by witnesses.

An early example of this principle is found in *Rex v. Smith* (1915), a case in which the defendant was charged with murdering his wife by drowning her in their bathtub. The bathtub was produced as an exhibit, and during the trial the jury foreman informed the judge that "[o]ne of the jury ha[d] expressed a wish that someone should be put in the bath for ocular demonstration." The judge replied, "I can only suggest to you that when you examine these baths in your private room, you should put one of yourselves in."[6]

---

**4.** *See Turpin v. State,* 890 P.2d 1128, 1131 (Alaska App.1995), defining "extraneous information" as "information that reaches the jury other than through the normal trial process[,] such as prejudicial publicity, pressure placed on jurors from outside sources, use of extrajudicial information, and the like." (Quoting Stephen A. Saltzburg, Michael M. Martin, & Daniel J. Capra, *Federal*

*Rules of Evidence Manual* (6th ed.1994), Vol. 2, p. 777.)

**5.** Citing *Hard v. Burlington Northern Railroad Co.,* 870 F.2d 1454, 1462 (9th Cir.1989).

**6.** *Notable British Trials, Series 1922,* Trial of George J. Smith, page 118 (quoted in John Henry Wigmore, *Evidence in Trials at Common Law*

Twenty years earlier, on this side of the Atlantic, the Virginia Supreme Court upheld an even more intrusive jury experiment in *Taylor v. Commonwealth*, 90 Va. 109, 17 S.E. 812 (1893). *Taylor* was a murder prosecution in which the government introduced expended cartridges that bore particular marks left by the murder weapon's "plunger"—what we now call the firing pin. The defendant responded by introducing evidence that the firing pin of his rifle did not make such marks on expended cartridges. During their deliberations, the jurors called for the defendant's rifle to be brought to the jury room, and then they dismantled the weapon to see if someone had tampered with the firing pin. (The jurors discovered that, indeed, the firing pin "had been recently tampered with and fixed for the occasion of the trial".) Rather than condemning the jurors' action, the Virginia Supreme Court commended the "intelligent and scrutinizing jury" for making this discovery. *Id.*, 17 S.E. at 816.

Several more recent cases are listed and described in this Court's decision in *Bowlin v. State*, 823 P.2d 676, 679 (Alaska App.1991).

In *People v. Kurena*, 87 Ill.App.3d 771, 43 Ill.Dec. 277, 410 N.E.2d 277 (1980), jurors constructed a cardboard replica of a knife that had been admitted into evidence, and then they used this replica to re-enact the assault, to see if the victim's wounds could have been inflicted by a left-handed or right-handed person, and to see if the weapon could have been concealed in a sleeve.

In *State v. Thompson*, 164 Mont. 415, 524 P.2d 1115 (1974), jurors used a handgun that had been admitted into evidence to re-enact the struggle described in the testimony, to see if the gun could have been fired if it was held in the manner described in the testimony.

In *Allen v. State*, 141 Tex.Crim. 94, 146 S.W.2d 384, 386 (1940),[7] the jury experimented with a pistol admitted into evidence to see if, as claimed by the defendant, the cylinder would "hang" or stick at a particular place in its revolution and cause the handgun to discharge accidentally.

In *State v. Best*, 89 S.D. 227, 232 N.W.2d 447, 457 (1975), a defendant on trial for child abuse claimed that her infant's injuries had been inflicted when the baby's two-year-old brother struck the baby with a telephone. The jurors experimented with the telephone (which had been admitted into evidence), testing its weight to see if it was conceivable that a two-year-old could have used it to inflict serious injury.

In *People v. Engler*, 150 A.D.2d 827, 540 N.Y.S.2d 591, 594 (1989), jurors experimented with a vaporizer to test the defendant's claim that a child's injuries had been sustained when the child carelessly played near the vaporizer.

And in *Taylor v. Reo Motors, Inc.*, 275 F.2d 699, 705 (10th Cir.1960), the jurors dismantled and reassembled a heat exchanger to test a witness's testimony about the way it functioned.

In addition to these cases listed in *Bowlin*, several other appellate decisions have approved experiments conducted by the jury during deliberations.

In *State v. Balisok*, 123 Wash.2d 114, 866 P.2d 631, 663–34 (1994), the court held that the jurors' re-enactments of the alleged struggle between the defendant and the victim were not "extrinsic evidence" and thus did not constitute jury misconduct.

In *United States v. Hephner*, 410 F.2d 930, 936 (7th Cir.1969), the court upheld a jury experiment in which one juror covered his head and donned sunglasses so that the jurors could evaluate whether it was possible to identify a person who was disguised in this manner.

In *People v. Agado*, 964 P.2d 565, 567–68 (Colo.App.1998), the court upheld the jurors' experimentation with a gun admitted into evidence to determine its trigger pull, and thus to evaluate defendant's testimony.

In *State v. Chamberlain*, 112 N.M. 723, 819 P.2d 673, 676, 683 (1991), a case in which the defendant claimed self-defense, and in which the government and the defendant offered

---

(Chadbourn rev'n, 1972), § 1160, Vol. 4, p. 357, n. 1).

7. Overruled on other grounds by *Stiles v. State*, 520 S.W.2d 894 (Tex.Crim.App.1975).

competing versions of when a police officer had pulled his gun from its holster, the jurors experimented with the gun and holster to ascertain the sound made when the gun was removed from the holster, and then they listened for that sound when they reviewed the audio recording of the encounter between the officer and the defendant.

In *United States v. Abeyta*, 27 F.3d 470, 477 (10th Cir.1994), the defendant was charged with stabbing another man during a confrontation outside a bar. Using a pocket knife owned by one of the jurors, the jurors engaged in a re-enactment of the events described by the witnesses. The circuit court of appeals held that this jury experiment did not entitle the defendant to a new trial. The court stated, "There is simply no constitutional command preventing a jury from using common sense and ordinary and uninflammatory props to reenact a crime in the privacy of the jury room."

In *United States v. Silks*, unpublished, 1988 WL 141090 (9th Cir.1988), the defendant was charged with conspiracy to unlawfully import controlled substances. The government introduced a composite drawing of the pilot of the airplane that was used to transport the controlled substances. However, in conformity with witness accounts, the pilot depicted in this composite drawing was clean shaven, while Silks was wearing a beard during the trial. During their deliberations, the jurors requested additional copies of a composite drawing of the pilot. At least one member of the jury drew a beard on the drawing—presumably to see if the drawing, so modified, resembled the bearded Silks.

The Ninth Circuit upheld this jury experiment: "It is not misconduct when the jury uses its own senses in weighing the evidence presented to it. The jurors must be given enough latitude to permit them to use common experiences and illustrations in reaching their verdict.... The jurors had observed Silks, and the type of beard he was presently wearing, in the courtroom during trial. The jurors' own attempts to evaluate the evidence to reach a verdict do not rise to the level of juror misconduct." 1988 WL 141090 at *2.

In *United States v. Avery*, 717 F.2d 1020, 1026 (6th Cir.1983), the defendant was charged with attempting to blow up a building. The police received a late-evening burglar alarm signal from a medical office building; within minutes, an officer arrived to investigate and found the defendant crouched down outside a storage area at the rear of the building. A subsequent inspection of the building revealed that the rear storage door had been pried open. Inside a crawl space underneath the building, the police found a substantial quantity of flammable materials, including four canisters of propane, two gallon jugs and fifteen milk cartons containing gasoline, newspapers (some of which had address labels listing the defendant's name and address), and a roll of wax paper.

During the summations to the jury, the defense attorney argued that it was impossible that the defendant could have hidden all of these materials in the crawl space within the approximately three minutes between the time the burglar alarm went off and the time the police arrived to investigate. The prosecutor responded that he thought it would be possible, and he described how he thought it could be done. *Id.* at 1026.

On appeal, the defendant claimed that the prosecutor's remark was, essentially, an invitation to the jurors to conduct an unauthorized experiment. The circuit court of appeals concluded that, even if the jurors had experimented with the evidence in the manner suggested by the prosecutor, this would have been proper:

> The record reveals that the defense, through expert testimony, put into issue the question of how long it would take to place the materials into the crawl space. Indeed, the defense theory of the case was that the defendant could not possibly have moved and assembled all of the materials in a three[-]minute period. This argument was repeated by defense counsel on at least two occasions during his closing argument. Under these circumstances, we believe the prosecutor could respond to [the] defendant's argument by asking the jury to handle the milk cartons and recreate portions of the defendant's actions. Even assuming the jury did recreate the defendant's actions, we find no error in such conduct.... [J]urors must be given

enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdict. *Avery*, 717 F.2d at 1026.

See also *People v. Smith*, 59 N.Y.2d 988, 466 N.Y.S.2d 662, 453 N.E.2d 1079 (1983), where the New York Court of Appeals applied this same principle to an experiment conducted by a single juror. One of the disputed issues at Smith's trial was a police officer's purported ability to observe the interior of a car through its rear window. During deliberations, one of the jurors tested the officer's testimony by looking through the rear windows of various cars, both while the juror was walking to dinner with the other jurors and while the juror was riding in a bus with the other jurors to their hotel. The New York high court upheld the juror's experiments.

In each of the cases discussed above, juries performed experiments that could theoretically be viewed as infringing the defendant's rights to confrontation and cross-examination. Moreover, in many instances, the circumstances or conditions of the jury's experiment arguably—or even clearly—deviated from the circumstances or conditions of the events being litigated. This leads to an obvious difficulty: because the jury experiment takes place in private, neither the judge nor the defense attorney can point out the potential weaknesses in the jury's method of procedure, or point out the circumstances or conditions that the experiment omits or fails to take adequate account of, or point out the potential ambiguities in the experiment's result.

Given these problems, one might argue that juries should always be barred from engaging in unsupervised experimentation. And yet no rule of prohibition emerges from these cases. Instead, these courts have condoned jury experiments—sometimes fairly elaborate jury experiments—under the principle that "[j]urors must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdict." *United States v. Hephner*, 410 F.2d at 936.

In Judge Stewart's dissent, he notes that many of these jury experiment cases were decided before this Court issued its decision in *Gorz*. Judge Stewart then concludes that "it is [not] beneficial to rely on . . . authority [from other jurisdictions] when the rule adopted in *Gorz* is clear".

It may be true that the rule stated in *Gorz* is "clear" and uncomplicated, but this is only because *Gorz* does not accurately describe the complexity of the law on this point.

In *Gorz*, the discussion of the issue of jury experimentation is both short and conclusory:

> The law governing this issue is well settled. Jurors have a duty to consider only the evidence presented in open court. Thus, a juror commits misconduct by conducting an unauthorized experiment and either personally relying on the results or communicating [those results] to other members of the jury. Evidence that has not been subjected to the procedural safeguards of trial impinges on the constitutional rights to confrontation, cross-examination, and counsel. *Turner v. Louisiana*, 379 U.S. 466, 472–73, 85 S.Ct. 546, 549–550, 13 L.Ed.2d 424 (1965).
>
> . . .
>
> In the present case, . . . a member of [the] jury committed misconduct by personally determining the amount of time it would take to walk from the scene of the explosion to the Alaska Motor Inn. This point is not seriously disputed by the state.

*Gorz*, 749 P.2d at 1355.

The *Gorz* opinion does not acknowledge any of the court decisions discussed above (or any others like them). In these decisions— many of which were issued decades before *Gorz*—courts upheld jury experiments that were similar in nature to the experiment conducted by the jurors in Pease's case.

Judging from this Court's comment in *Gorz* that the claim of juror misconduct "[was] not seriously disputed by the state", it appears that this Court may not have received adversarial briefing on the issue of what types of jury experimentation are lawful—and, thus, this issue may not have received focused attention. But in any event, a review of the cases in this area demonstrates

that the bright-line rule stated in *Gorz* does not accurately reflect the law on this subject.

*Application of this law to Pease's case*

 Under the cases discussed above, if a question had arisen in Pease's case as to whether a particular placard was legible from ten feet away, or whether the color of a particular object could be discerned in dim light, there would be no impropriety in the jury's experimenting with these objects in the privacy of the jury room.

The experiment conducted in Pease's case presents even less cause for concern in terms of a defendant's rights of confrontation and cross-examination. The focus of the jury's inquiry was not a case-specific assertion about the quality or condition of a particular object or event. Rather, as Judge Esch found, the jury's attention was primarily focused on testing the generalized assertion made by Pease's expert witness, Dr. Loftus—the assertion that it is impossible, even under the best conditions, for one human being to recognize another at distances of more than 200 feet.

It appears that the jurors first attempted to test Dr. Loftus's assertion in the jury room—by looking out of the window to see if they could recognize people at a distance. Under the cases discussed above, this type of experiment was proper. The jurors took advantage of an experience afforded by everyday life—the experience of observing people at a distance from the window of a multistory building—to directly test the accuracy or inaccuracy of Dr. Loftus's assertion.

(Indeed, this Court has little doubt that, by this point in our discussion, many of our readers have been tempted—or have already succumbed to the temptation—to peer out of their own windows and try the experiment for themselves.)

When this question concerning the limits of human perception became a disputed issue at Pease's trial, the jurors were undoubtedly entitled to rely on their own experience when they discussed and ultimately assessed the credibility of Dr. Loftus's assertion. And, based on the cases discussed above, the jurors were also authorized to make test observations through the jury room window to help them resolve this question.

The real problem in this case arises because the jurors disagreed in their estimates as to how far away the observed people were. The jurors therefore decided to move the test outside, where they could get a better measurement of the distance.

By leaving the jury room, the jurors engaged in conduct that courts are much less likely to condone. We acknowledge that, in numerous instances, courts have held that jurors committed misconduct when they ventured out of the jury room to view the scene of the crime, or to assess how long it would take to travel from one place to another, or to conduct other case-specific experiments. Our own decision in *Gorz v. State* is a prime example.

We nevertheless conclude that the jurors' conduct in Pease's case presents a materially different situation from the ones described in the preceding paragraph. As Judge Esch found, the circumstances surrounding the experiment show that the jurors were not attempting to re-create Arlo Olson's nighttime observation of the assault on Franklin Dayton. Rather, the jurors were attempting to test Dr. Loftus's general assertion about the limits of human perception.

Conceivably, when disagreement arose among the jurors concerning the distance between the jury room window and the people whom the jurors were observing through that window, the jurors might have resolved this matter by deferring to the judgement of individual jurors who had more experience viewing people and objects at a distance—for example, a pilot or a soccer coach. If the jurors had done so (thus obviating the need for them to leave the jury room), this would be an easier case.

But the jurors (for whatever reason) were unable to resolve their disagreement by discussion and debate. So, instead, they decided to renew their observations outside, where they could use a more objective method for measuring the distance.

It is true that the jurors conducted this experiment without the authorization of the court. But we believe that, given the circum-

stances, reasonable judges would have allowed the experiment if the jurors had asked. Because the main objective was to test Dr. Loftus's assertion about human perception under optimal conditions (rather than to re-create Arlo Olson's personal experience of viewing other people at a particular distance on the night of the crimes), it did not matter that there were obvious differences between the jurors' experiment and the actual events being litigated.

On this point, see *Bierria v. Dickinson Manufacturing Co., Ltd.*, 36 P.3d 654, 658–59 (Alaska 2001), a case that addresses the issue of what courts mean when they insist that the conditions of a proposed experiment be "substantially similar to the conditions at the time of the event in issue." [8] In *Bierria*, our supreme court emphasized that the concept of "substantial similarity" hinges on what the experiment is offered to prove. Often, there are identifiable dissimilarities between the circumstances of the experiment and the real-life event being litigated; nevertheless, the experiment is still "substantially similar" if these dissimilarities are irrelevant to what the proponent of the experimental evidence is trying to prove.

Here, the jurors wished to test Dr. Loftus's assertion that it was impossible, even under the best of conditions, to recognize another person at a distance of greater than 200 feet. Given this purpose, it is irrelevant that the jurors' observations of each other, in daylight on Third Avenue in Anchorage, bore obvious dissimilarities to the nighttime observation described by Arlo Olson in his testimony.

For this same reason, the fact that neither Pease nor his defense attorney were present to witness and critique the experiment is not particularly important. In Pease's pleadings (both in the superior court and on appeal), he argues that the jurors' experiment was irremediably flawed because the jurors may have failed to perceive, or may have misperceived, crucial differences between the circumstances and conditions of their experi-

ment and the circumstances and conditions of Arlo Olson's observation on the night in question. But, as explained above, we conclude that these differences are immaterial.

We note, moreover, that Pease and his attorney would not have been present if the jurors had followed the lawful course of remaining inside the jury room and resolving their disagreement about the distances involved through discussion and debate, or by deferring to the judgement of individual jurors who were deemed to have better skill at estimating distances.

In sum, we conclude that the jurors' experiment was a proper type of inquiry for the jury to make, even though the jurors committed misconduct when they left the jury room for this purpose without the court's permission.

■ The remaining question is whether the jurors' act of leaving the jury room without authorization requires reversal of Pease's convictions.

As this Court noted in *Gorz*, 749 P.2d at 1355, not all acts of jury misconduct require reversal of the jury's verdict. In fact, our supreme court has declared that "generally the verdict should stand unless the evidence clearly establishes a serious violation of the juror's duty *and* [this violation of duty] deprives a party of a fair trial." *Fickes v. Petrolane–Alaska Gas Service, Inc.*, 628 P.2d 908, 910 (Alaska 1981), quoting *West v. State*, 409 P.2d 847, 852 (Alaska 1966).[9]

We conclude that the act of jury misconduct presented in Pease's case—*i.e.*, the act of leaving the jury room without authorization to conduct an experiment that was otherwise proper—is not a "serious violation of the [jurors'] duty" for purposes of the *Fickes/West* test.

Moreover, even assuming that the act of leaving the jury room was a serious violation of the jurors' duty, we further conclude that the jury's experiment did not deprive Pease of a fair trial. As we have explained, the jurors' primary purpose was to test Dr. Lof-

---

**8.** *Beck v. State Department of Transportation and Public Facilities*, 837 P.2d 105, 113 (Alaska 1992).

**9.** The emphasis on the word "and" is not present in the original quotation from *West;* it was added by the *Fickes* Court.

tus's general assertion about the limits of human perception under optimal conditions. The experiment, in itself, was proper. And, given the purpose of the experiment, there is no reason to believe that the experiment yielded a false or misleading result (*i.e.*, a result that the jurors could not understand or meaningfully evaluate).

Thus, even though the result of the experiment may have influenced the jury's ultimate decision, the fact that the jurors conducted this experiment does not require reversal of Pease's convictions.

*Conclusion*

For the reasons explained here, the superior court's decision to grant Pease's petition for post-conviction relief is REVERSED, and Pease's convictions are reinstated.

COATS, Chief Judge, concurring.

STEWART, Judge, dissenting.

COATS, Chief Judge, concurring.

A contested issue at Pease's trial was whether Arlo Olson, from a distance of 400 feet or more, could identify the people who attacked Franklin Dayton. Olson testified that he could identify the four assailants from this distance. To rebut Olson's testimony, the defense called Dr. Geoffrey Loftus, an expert in human visual perception and memory. Dr. Loftus testified that, even under optimal conditions, it was impossible to identify someone from even 200 feet away.

During their deliberations, the jurors attempted to test Dr. Loftus's assertion by looking out of the jury room window and observing the people below. Then, dissatisfied with this investigation, the jurors went outside and conducted the experiment that is at issue in this case.

The ultimate question facing Judge Esch, and now this Court, is whether the jurors' act of conducting this experiment on the street outside the jury room undermines confidence in their verdict to such an extent that we should grant Pease a new trial.

We would certainly expect jurors to critically examine Dr. Loftus's assertion that it is not humanly possible to identify a person from a distance of 200 feet. It is all but inevitable that, faced with this assertion, the jurors would test it. We frequently observe other people at a distance in our daily life, and it seems obvious that, after hearing Dr. Loftus's testimony, any juror with normal curiosity would test their own ability to observe and identify people at a distance— probably by doing something similar to what the jurors did in this case: looking out the window of the jury room, or looking down the street during a lunch break or when driving home at night.

Had the jurors stopped there, it seems unlikely that Pease would be entitled to a new trial. It would simply be a matter of the jurors using their common sense and everyday experience to resolve a factual issue.

We could, of course, try to stop jurors from personally assessing the credibility or probative force of in-court testimony—by specifically instructing jurors not to conduct these types of common-sense experiments and observations. But if we did this—if the law strictly prohibited jurors from conducting any kind of extrajudicial evaluation whatsoever—then it is unlikely that any verdict would withstand close scrutiny. After an adverse verdict, a disappointed litigant could obtain a new trial by simply questioning the jurors and getting them to admit that they did something to test the factual assertions that they heard in court.

It is true that the jurors in Pease's case did not limit themselves to observations from the jury room window. Instead, they engaged (as a group) in mutual observation at a distance on the street. But it does not seem to me that this materially changes the analysis.

Even though the jurors continued their testing on the street, observing each other at a distance, they were still engaged in the same kind of common-sense experimentation, based on everyday experience, that would have occurred had the jurors confined their observations to the jury room. In fact, the jurors were probably able to conduct a more accurate experiment on the street, since they could be sure that they were all making their observations across the same distance.

It is true, as Pease points out, that the credibility of Dr. Loftus's testimony was not the ultimate issue. Dr. Loftus's assertion about the limits of human perception was relevant because it undercut Olson's claim that he was able to identify the men who attacked Franklin Dayton.

Moreover, Olson admitted that he had been drinking and that it was dark when he made the identification, and he further admitted that he was able to see the men for only a limited time. Thus, the conditions under which the jurors observed each other on the street were quite different from the circumstances surrounding Olson's observations. But the circumstances of Olson's observation, and the potential difficulties that he faced in making the identification, were thoroughly aired at Pease's trial and were extensively argued to the jury. It is unrealistic to think that the jurors were unaware of the differences between the circumstances of their experiment and the actual circumstances of Olson's identification.

Because the jurors must have been aware of these substantial differences, the jurors' experiment only makes sense as a test of Dr. Loftus's testimony, not a test of Olson's testimony. If the jurors found that Dr. Loftus's assertion about the limits of human perception under optimal conditions was accurate, this would largely undermine the credibility of Olson's testimony. But even if the jurors concluded that Dr. Loftus had exaggerated the limitations of human perception, the jurors would still have to resolve the question of whether, under less-than-optimal conditions, Olson could make an accurate identification of the men who attacked Franklin Dayton.

It appears to me that the jurors engaged in a sensible effort to resolve the credibility of Dr. Loftus's testimony, and that they understood both the significance and the limitations of their experiment. This was the sort of factual issue that we routinely trust juries to resolve using their common sense and their combined life experience. For these reasons, I conclude that the jurors' conduct does not undermine the trustworthiness or fairness of their verdict. Thus, Pease is not entitled to a new trial.

STEWART, Judge, dissenting.

I disagree with the majority for three reasons. I characterize Judge Esch's decision differently than the majority. I conclude that the jury conducted an unauthorized experiment under *Gorz v. State*.[1] And I would uphold Judge Esch's conclusion that Pease is entitled to post-conviction relief.

During discovery in this case, several jurors from Pease's trial confirmed that the entire panel left the Nesbett courthouse in the middle of deliberations and performed an experiment. The jurors generally agreed that the purpose of the experiment was to see what another person looks like at the distances discussed in the testimony, to see what the relevant distances were on the ground, and to test the validity of Arlo Olson's testimony. Olson was the only witness who placed the defendants at the scene of the first crimes occurring on October 11 (the charges of robbery and assault of Franklin Dayton).

The capability of anyone to reasonably identify a person from a distance was the subject of expert testimony and a contested issue. Although more than sixty witnesses testified during the trial, only Olson testified that he saw the defendants robbing and assaulting Dayton. Other witnesses offered conflicting evidence about the defendants' whereabouts when these crimes occurred.

Olson testified that he spoke with one of the men, all four of whom were together in Marvin Roberts's car, at the front steps of Eagles Hall in Fairbanks before the assault on Dayton. Approximately thirty minutes passed before Olson said he saw four men attack Dayton down the street.

Olson confirmed that it was dark outside, but that there were a number of lights nearby, including lights from a nearby gas station and street lights. Olson also stated that, although he was approximately 150 yards from the site of the assault, he recognized Dayton, George Frese, and Eugene Vent immediately because he had known them for a

1. 749 P.2d 1349 (Alaska App.1988).

while. He further stated that the men had their backs to him for part of the time but that he got a clear look at all four men for approximately three or four seconds while they were hurrying back to the car. Olson conceded that he would have needed binoculars to distinguish the men's facial features, but he could recognize them by their hair and build. Olson also recognized the car the men got into as the blue car he had seen them in earlier.

A day or two later, Olson read an article in the newspaper implicating Frese, Pease, Roberts, and Vent in J.H.'s murder (an act for which he was separately convicted and which is not the subject of this appeal). The article included head shots of the four men. Olson testified that he recognized the defendants as the same men who assaulted Dayton. Olson did not immediately contact the police because he did not want to turn in his friends, but ultimately, he changed his mind and reported the assault. Olson told the police that he recognized the four men from the newspaper as the four who had assaulted Dayton.

Olson admitted drinking alcohol that evening. He conceded that during the attack on Dayton, the assailants often had their backs toward him, and that he only got a good look at them as they ran back to their car after attacking Dayton. And while Olson estimated that Dayton was attacked approximately 150 yards away from him, there was evidence presented that the distance was closer to 550 feet (approximately 183 yards).

To impeach Olson's testimony, the defense presented an expert witness, Dr. Geoffrey Loftus. The superior court qualified Dr. Loftus as an expert in human visual perception and memory. Dr. Loftus testified that one's "ability to distinguish [one person] from somebody else, in other words to recognize them later on, is essentially nil" at distances greater than 200 feet. He testified that this is true even in the best of circumstances, with full light, unlimited time, and a sober and alert observer.

During deliberations, the bailiff accompanied the jurors as they walked to the corner of Third Avenue and I Street in Anchorage. A juror paced off a distance he believed was 350 or 360 feet and stopped in front of the entrance to an office building near the intersection of Third Avenue and K Street. This distance was later measured at approximately 434 feet. According to at least two accounts, another juror also walked down to the same spot. The jurors then looked at each other to determine whether they could recognize one another at that distance, and a few jurors stated that they also looked at passersby to test whether they could distinguish the features of those strangers. Although most of the jurors could not remember precisely what time it was when they conducted the experiment, they all agreed that it was during daylight hours.

In their depositions, the jurors generally agreed that the purpose of the experiment was to get an idea of the distance discussed in the testimony and to see what another person looks like at that distance. One juror testified:

> Well, part of the testimony was that an incident had happened at that distance from the wedding reception.... And I think the [contention] was that it would be difficult to see accurately at that distance. And so it was just a matter of satisfying ourselves whether that was, in fact, true or not.

According to another juror:

> The idea was to see if there was some way we can actually, you know, if it's a question of can we see a certain distance, can we get an idea, just by going out and pacing— not pacing off, but somehow guessing what that distance would be, just to feel comfortable[.]
>
> . . .
>
> I don't like the word "experiment," but that probably sums it up. Bottom line, it was, to me, a confidence builder or some sort of satisfaction that ... my assumptions were right to begin with.

This juror also stated that on "one of the first days[, the jurors] went to the window and asked each other, how far do you think that thing is[?]"

When asked about the "connection [between] this experiment and the trial testimony," a third juror responded: "There was

some discussion around ... what you could see from that distance, could you—could you see a person at that distance or persons[?]" A fourth juror stated that the experiment "had a singular purpose, that was to try to—you know, I suppose for each person to make up his own mind what he thought about how far he could recognize somebody." And a fifth juror explained that she recalled "discussions about distance ... and references to, you know, say, a football field.... And, you know, tell me a football field, and I have no idea what you're talking about. Show me what you mean; I know what you mean." She said the experiment outside the courthouse was designed to show how far the distance they had been discussing actually was.

A sixth juror could not remember how the experiment came about but recalled that it was hot out and speculated that "it could have been [they] were going to go for a walk, and then there was a discussion of how far that distance was, and so from there, it turned into looking at each other to see what it looked like from that distance." She also recalled that an expert witness for the defense "had said it was impossible [to recognize someone at the distances in question], [that] he couldn't recognize his mother, and [she] remember[ed] that a lot of [the jurors] were talking about that, about whether or not that was true, whether that was accurate."

According to a seventh juror,

some of the jurors were kind of confused about how far is that distance, you know, in relation to whatever, and so we ... [went] outside as a group and [tried] to walk off or have somebody stand down where we determined to be a certain distance, ... and so we had a person do that.

Finally an eighth juror recalled the purpose of the experiment as follows:

[The purpose was] just to see what someone would look like at 500 feet away, you know, or—because in my mind I have a hard time figuring out what 500 [feet] would be. I kind of—one of reference of, like, a football [field] is 300 feet. And 500

feet is just—I remember I kept thinking that's just—I don't have any reference point. I don't know what someone would look like, if they'd look like an ant or if they'd look halfway recognizable or whatever. So that's why I was—you know, that was my two cents I chipped in on our discussion about doing this whole thing.

This juror also explained that, because he has poor eyesight, he could not recognize the people down the street. But he listened to what the other jurors were saying and took into consideration that they said they could recognize the other jurors down the street. According to this juror, "it seems like at least half of the people said, 'Oh, yeah, I can tell that is so and so,' then it made it believable to me that it's possible. It removed the doubt that one might have that it's impossible to see someone or identify someone at 500 feet."

Thus, some jurors agreed that a purpose of the experiment was to test whether Olson could have recognized the defendants.

Pease moved for summary disposition of his application for post-conviction relief, arguing that the jury performed an unauthorized experiment and that the experiment constituted jury misconduct that denied him his rights of confrontation and cross-examination. The State opposed, contending that the jurors' actions did not constitute an unauthorized experiment and that Pease had not demonstrated that his conviction was unfair.

Judge Esch found that the material facts were not in dispute. Judge Esch found that the jurors conducted an unauthorized, out-of-court experiment to assess the credibility of Olson's and Dr. Loftus's trial testimony. (In its initial briefing, the State did not challenge Judge Esch's factual findings, and agreed at oral argument that the jury's experiment was misconduct.)

Judge Esch applied the standard for evaluating jury misconduct that this court described in *Gorz v. State*[2]: "[T]he ultimate issue in any case involving juror misconduct is whether it can be said beyond a reasonable doubt that the misconduct did not contribute

2. *Id.*

to the verdict." [3] He ruled that the misconduct "was likely to have influenced the jury," and could not find that "the jury [misconduct] did not 'contribute' to the ultimate verdict of guilt." Accordingly, he granted post-conviction relief.

The experiment that led to the reversal of the defendant's conviction in *Gorz* was simple.[4] Gorz was charged with first-degree arson arising out of an explosion that occurred at an apartment building in Fairbanks.[5] Gorz presented an alibi defense that was based, in part, on evidence that Gorz and his co-defendant were seen a couple of blocks from the apartment building about fifteen minutes after the blast.[6] The State did not present any specific evidence on the time it would take to walk from the site of the explosion to where Gorz was seen, but it did establish that the distance between these two locations was about two blocks.[7]

During a recess in the jury's deliberations, one of the jurors walked from the crime scene at the apartment building to the place where Gorz was seen.[8] Apparently, the walk took four to five minutes.[9] Gorz argued that the juror's experiment constituted misconduct.[10]

This court reversed Gorz's conviction, ruling that:

> a juror commits misconduct by conducting an unauthorized experiment and either personally relying on the results or communicating them to other members of the jury. Evidence that has not been subjected to the procedural safeguards of trial impinges on the constitutional rights to confrontation, cross-examination, and counsel.[11]

Judge Esch cited *Gorz* in ruling that the jurors had improperly conducted an unauthorized, out-of-court experiment. Judge Esch found that the jury sought "to test the validity of Loftus'[s] testimony," and to "assess [ ] the validity of the testimony of Arlo Olson."

Next, to evaluate the effect of the unauthorized experiment, Judge Esch turned to a test set out in *Swain v. State* [12]:

> The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror. Though this test may seem unduly speculative, it has significant support in the case law, and there appears to be no more precise way to articulate the standard.[13]

Judge Esch ruled that the experiment "was likely to have influenced the jurors' deliberations." He found that the trial was "rife with conflicting testimony," especially Olson's identification testimony and the impeaching expert testimony from Dr. Loftus, and an experiment designed to address this dispute in the evidence was "likely to have influenced the verdict."

On reconsideration, Judge Esch rejected the State's claim that the evidence against Pease was so overwhelming as to negate the effects of the juror misconduct. He described the evidence against Pease as "compelling" but, applying the *Swain* test's beyond a reasonable doubt standard, he could not find "that the jury action did not 'contribute' to the ultimate verdict of guilt."

The majority contends that Judge Esch found that the jury's primary purpose was to test Dr. Loftus's assertion that it was impossible for a person to recognize another at distances of more than 200 feet. I do not read Judge Esch's decision as being so limit-

3. *Id.* at 1355.

4. *Id.* at 1350–55.

5. *Id.* at 1350.

6. *Id.* at 1352.

7. *Id.*

8. *Id.*

9. *Id.*

10. *Id.* at 1353–55.

11. *Id.* at 1355.

12. 817 P.2d 927 (Alaska App.1991).

13. *Id.* at 932 (quoting 2 ABA Standards for Criminal Justice § 8–3.7, Commentary at 58 (2d ed.1980)).

ed, because the judge also found that the jury was attempting to test the validity of Olson's testimony.

The evidence also points out problems with the jury experiment. During trial, there was evidence that Olson was 550 feet from the nighttime attack on Dayton. A measurement of the distance paced off by a juror in the experiment showed it to be less than 435 feet.

Because the jurors were testing more than Dr. Loftus's testimony, I do not agree that we can conclude that reasonable judges would likely have authorized the experiment they conducted. Experimental evidence is admissible when the conditions of the experiment are substantially similar to the conditions at the time of the event in issue.[14] In *Love*, the supreme court announced a multipart analysis to decide whether the conditions were substantially similar.[15] The factors include: (1) whether the dissimilarities are likely to distort the results of the experiment to a degree that the evidence is not relevant; (2) whether the dissimilarities can be adjusted for or explained so that their effect on the results can be understood by the jury; (3) the purpose of the experiment and the degree to which the matter under experiment is a subject of precise science; and (4) whether the experiment would be considered valid by persons skilled or knowledgeable in the field which the experiment concerns.[16]

The conditions of the jury's experiment differed markedly from the conditions facing Olson. Olson viewed the attack on Dayton at night at a distance of about 550 feet under artificial lighting. The jurors were looking at each other during the daytime at a distance more than 100 feet less than Olson faced. Considering the differences in the lighting and the significant variation in distance, I conclude that the conditions were not substantially similar.

The majority also discusses several cases that review jury experiments. Most of the experiments in those cases occurred in the jury room with evidence admitted during trial. And the majority of those cases were decided before *Gorz*. I do not think it is beneficial to rely on other authority when the rule adopted in *Gorz* is clear: a juror conducting an unauthorized experiment that develops evidence untested in open court violates the defendant's constitutional rights.[17]

Because such an experiment is a constitutional violation, a conviction cannot stand unless the court can conclude, beyond a reasonable doubt, that the misconduct did not contribute to the verdict. I would affirm Judge Esch's conclusion that the unauthorized experiment was likely to have influenced the jury's deliberations. Therefore, I dissent.

---

14. *Love v. State,* 457 P.2d 622, 627 (Alaska 1969).

15. *Id.* at 628.

16. *Id.*

17. *See Gorz,* 749 P.2d at 1355. *See also United States v. Navarro–Garcia,* 926 F.2d 818, 821–23 (9th Cir.1991); *People v. Castro,* 184 Cal.App.3d 849, 852–54, 229 Cal.Rptr. 280 (1986); *People v. Legister,* 75 N.Y.2d 832, 552 N.Y.S.2d 906, 552 N.E.2d 154, 154–55 (1990); *People v. Brown,* 48 N.Y.2d 388, 423 N.Y.S.2d 461, 399 N.E.2d 51, 53–54 (1979).