James D. WEST, Appellant,

v.

STATE of Alaska, Appellee.

No. 572.

Supreme Court of Alaska.

Jan. 21, 1966.

C. R. Kennelly, Nome, Millard F. Ingraham, Fairbanks, for appellant.

Warren C. Colver, Atty. Gen., and Theodore E. Fleischer, Asst. Atty. Gen., Juneau, for appellee.

Before NESBETT, C. J., and DIMOND and RABINOWITZ, JJ.

NESBETT, Chief Justice.

Appellant was indicted for manslaughter and found guilty by a jury. The principal point raised on appeal is whether the proof of the cause of death was sufficient.

Appellant was the owner of the Board of Trade Bar in Nome, Alaska and was tending bar on the evening of April 17, 1964, when Richard Nershak, a 58 year old Eskimo, entered the establishment. About 15 minutes later and presumably because of the attention Nershak paid to appellant's wife who was sitting at the bar, appellant came from behind the bar, threw Nershak to the floor and kicked him in the head at least twice and once in the side. Appellant then dragged Nershak outside, propped him against the building in a sitting position, bounced his head against the building several times and kicked him in the head and body. One of the witnesses summoned a police officer who took Nershak to the hospital where he was pronounced dead by the doctor within approximately ten minutes after the attack.

A four hour autopsy was performed by Dr. Fenstermacher, who discovered a fresh hemorrhage over the right kidney, lacerations on the inside and outside of the upper lip and a broken front tooth. Specimens from the autopsy were mailed to Dr. Beirne, a pathologist in Anchorage.

Dr. Beirne found degeneration of the kidneys, some lung inflammation and a large amount of alcohol in the blood and gastric contents which indicated to him that Nershak was quite intoxicated. The examination of neither doctor revealed any particular sufficient cause of death. It was the opinion of both doctors that Nershak's death was caused by shock induced by the physical attack he had suffered.

Dr. Fenstermacher and Dr. Beirne testified as medical experts at the trial. In response to hypothetical questions incorporating pertinent facts relating to the deceased and the physical attack made upon him by appellant, both doctors testified that the beating Nershak received induced shock which caused his death.

Dr. Beirne testified in some detail concerning shock as follows: He defined it as a term used in medicine to describe the condition of the body when it collapses and fails to respond to an injury. A person who sees blood and faints suffers from mental shock, one receiving an injury to the body may suffer from physical shock. The average person responds fairly well to an injury up to a certain point, but beyond that point the person goes into shock whereupon the heart beat slows down, blood pressure falls, the skin becomes cold and sweaty and the body defenses do not operate to correct the injury. It is not necessarily the extent of the damage done to the body that determines shock—a very small injury well placed is capable of causing death from shock, whereas an extensive injury, to the legs for example, would not necessarily cause death. Injuries to the flesh do not always show up well. A blow to the solar plexis in the stomach area can produce shock which may cause death. A kick in the testicles can cause a man to go into immediate deep shock and result in death. Where a victim has been alive and exhibiting no unusual symptoms, then receives a severe beating, collapses and dies, and other causes of death are eliminated (by autopsy), it is reasonable to believe that the cause of death was shock brought on by the beating.

■ Appellant argues that since the autopsy failed to determine the immediate medical cause of death, a sufficient causal relation between the physical attack and Nershak's death was not established. Specifically, he contends that there was not sufficient evidence of physical injuries capable of inducing shock; that the doctors unjustifiably assumed that shock had been induced by the injuries inflicted during the assault, and that death had resulted from the shock.

The issue raised by appellant is not new to the courts. A number of well considered decisions have been persuasive in our disposition of this point against appellant's contentions.

In Nordmeyer v. Sanzone,[1] which was a wrongful death action, expert medical testimony expressed the opinion that an automobile collision, which threw deceased forward causing his chest to strike the steering wheel, was the cause of the coronary thrombosis which caused his death five hours later. The court applied Kentucky law and stated:

It is settled law that expert medical testimony expressing an opinion as to the cause of death, based on a hypothetical question embracing the material facts supported by the evidence, does not invade the province of the jury, is admissible in evidence on the issue of cause of death, and although not conclusive on said issue, and even though it does not disprove every other possible cause of death, is sufficient to take such issue to the jury and to uphold a verdict in accordance therewith.

The appellant in *Nordmeyer* argued, as appellant has in the case before us, that there was not sufficient evidence of a traumatic injury and that the medical experts, in answering a hypothetical question, were required to assume the existence of trauma. After inferring a traumatic injury, the additional inference that the injury caused the thrombosis was drawn, according to appellant. It was argued that expert medical testimony expressing an opinion based upon an inference drawn from a previous inference is not sufficient to take the case to the jury. Appellant's construction of the evidence was rejected since the record contained testimony that because of the impact of the collision deceased was thrown forward, that his chest struck the steering wheel and that he lay there for a few minutes without speaking. This testimony, tending to show injury capable of producing trauma, was held to be more than an inference and sufficient to support the opinion testimony of the medical experts.

1. 314 F.2d 202, 204 (6th Cir.) additional damages denied, 315 F.2d 780 (1963).

In the case before us, Dr. Fenstermacher's autopsy revealed lacerations on the inside and outside of the upper lip and a broken front tooth, with fresh bleeding evident at both locations. A hemorrhage over one inch in diameter was found at the upper pole of the right kidney. The autopsy found that Nershak had several long standing medical problems and evidence of acute trauma, neither of which appeared sufficient to cause death. Dr. Fenstermacher testified that it would require a relatively severe blow to cause a hemorrhage to the kidney such as was found in the autopsy and that it would likewise require a severe blow to have broken Nershak's tooth and cut his lip. The kicks administered by appellant to the head, neck and body with dress shoes were described variously by the Eskimo witnesses as "hard enough", "just enough to hurt him", as a stomping or tromping on the head, as repeated kicks to the head accompanied by profanity from appellant at the conclusion of which blood was coming out of Nershak's mouth, as being kicks in the face of such force that Nershak's head would go back with a thud accompanied by the statement by appellant that " * * * I ought to break your ————— neck."

Officer Martin arrived on the scene immediately after the last kicks were ad-ministered and was unable to find any pulse on Nershak, whereupon he loaded the limp body into his car with appellant's assistance and drove to the hospital. Nershak was heard to gasp twice in the patrol car. Concurrently with the second gasp his chest heaved and his head went back. One last gasp was heard at the hospital. Attempts at resuscitation were commenced by Dr. Fenstermacher within ten minutes after the last blows were administered, but were abandoned. Nershak was declared to have been dead upon arrival at the hospital.

We are of the opinion that there was a sufficient factual basis for the conclusion of the medical experts that the physical assault administered by appellant was capable of and did produce trauma, which induced a state of shock, which caused Nershak's death. The hypothetical questions embodied the pertinent facts. The opinion testimony of the medical experts was properly before the jury. The verdict was supported by substantial evidence. The trial court did not err in refusing to grant a judgment of acquittal at the conclusion of the state's case,[2] nor in refusing to grant appellant's motion for judgment n. o. v. or in the alternative for a new trial.

■ Appellant's claim that the trial court violated a requirement of AS 09.20.070 [3] by

2. The facts in one respect are very similar to those in Outler v. State, 154 Ark. 598, 243 S.W. 851, 852 (1922) where death occurred a matter of hours after deceased was struck a blow on the head with a gun. It was held that in the absence of any evidence of another cause of death the jury was authorized to infer that death was caused by the blow. In Commonwealth v. Sullivan, 285 Ky. 477, 148 S.W.2d 343, 344 (1941) the victim of a blow died approximately four months later. Although no medical testimony established that the blow caused death, the court held that where a cause sufficient to cause death was shown and no other known cause existed, there was a sufficient basis to conclude that death resulted from the known cause.

3. AS 09.20.070 states:
   *Public drawing for jurors for panel.*
   Under the direction of the court the clerk shall conduct the public drawing of jurors for the panel by shaking the box to mix the named or numbered pieces. The clerk shall then draw as many names or numbers as are ordered by the court to fill the jury panel. If the name or number of a person is drawn from the box and the person is deceased, unqualified, disqualified, or the person's attendance cannot be obtained within a reasonable time or may involve a large and unnecessary expense, and the fact appears to the satisfaction of the court through the use of questionnaires or otherwise, the court may reject the name of that person and direct that the name or number of another be drawn in his place.

selecting trial jurors only from among residents of the Second Judicial District residing within a 30 mile radius of Nome is denied for the reasons stated in our decision in Crawford v. State, Opinion No. 312, 408 P.2d 1002 published on December 20, 1965. In Crawford we upheld a geographical limitation of a 15 mile radius from the City of Anchorage for the selection of grand jurors.[4]

■■ Appellant herein additionally contends that AS 09.20.070 is violative of Article 1, Section 11 of the Alaska Constitution.[5]

We disagree and hold that the statute is constitutional. Article 1, Section 11 is not to be construed to be any broader in scope than its counterpart provision of the Sixth Amendment to the United States Constitution.[6] The Sixth Amendment has been construed not to prohibit the drawing of jurors from one division only of the judicial district;[7] or from only one county of the judicial district which contained a total of 29 counties within its boundaries[8] nor the selection of grand and petit jurors from three of eleven counties within the judicial district although the population distribution was such that it was alleged to have resulted in an imbalance between urban and rural jurors.[9] These and other federal authorities are persuasive in our construction of Article 1, Section 11 of the Alaska Constitution.

■ The last point to be considered is appellant's claim that the verdict should have been stricken and a judgment of acquittal granted because the vote of juror George Lablin was coerced by fatigue and exhaustion.

After the trial Lablin's affidavit was filed and stated in part:

> During the trial I was called in and questioned by Judge Sanders about my relationship with James West. I was one of the last jurors to hold out for acquittal of James West, but after the Judge gave the supplemental instruction when I was one of the last to hold out I felt that I was under pressure and that if I didn't change my vote and vote for conviction, when the others had, then I might be subject to prosecution myself. That is I thought they may try to make something of my relationship with Jim West, and to say that I wasn't carrying out my duty as a juror.

At the hearing on appellant's motion for judgment of acquittal, Lablin was examined under oath. His testimony was that the pressure he was under was not outside pressure, but physical pressure resulting from 18 hours in the jury box, "* * * arguing with people like I had to contend with. * * * I was tired, worn out, and in a nervous state." He admitted that he was foreman of the jury; that after he had been questioned by the judge during the trial concerning his relationship with the appellant he nevertheless affirmed to the court that he could continue to serve as a juror and that he would be a fair and impartial juror; that he was aware that he could then have asked to be excused, but didn't know why he hadn't done so. When specifically asked by counsel for appellant

---

4. AS 12.40.010 provides that grand jurors shall have the qualifications and be drawn as are trial jurors.

5. Article 1, Section 11 of the Alaska Constitution in pertinent part states:
   In all criminal prosecutions, the accused shall have the right to a speedy and public trial, by an impartial jury of twelve * * *

6. Insofar as is relevant the Sixth Amendment states:
   In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed * * *

7. Ruthenberg v. United States, 245 U.S. 480, 38 S.Ct. 168, 62 L.Ed. 414, 418 (1918).

8. United States v. Titus, 210 F.2d 210 (2nd Cir. 1954).

9. United States v. Gottfried et al., 165 F.2d 360 (2nd Cir.), cert. denied, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139 (1948).

whether he voted for conviction with the rest of the jurors because he was afraid of possible criminal punishment, he did not substantiate his statement in his affidavit but replied: "Well, I, I just didn't know what to think." Lablin admitted that when the jury returned with its verdict he handed it to the bailiff and that when the jury was polled he stated to the court in response to the specific question, that the verdict was his true verdict; that after the jury was discharged he did nothing about his participation in the verdict until three or four days or a week later when counsel for appellant contacted him and obtained his affidavit.

It is the overwhelming weight of authority that a juror generally cannot impeach the jury's verdict by his testimony or affidavit. The public policy supporting this rule is well expressed in McDonald v. Pless [10] where the United States Supreme Court refused to permit jurors to testify that they had arrived at their verdict arbitrarily and unjustly by using the quotient formula. The court said:

> But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. * * *

The court observed that any detriment to a party resulting from the rule is outweighed by the benefit realized by preventing the tampering with or harassment of juries.

Exceptions to the general rule have been made and it has been held that the type of

misconduct which may impeach a verdict is fraud, bribery, forcible coercion or any other obstruction of justice.[11] Whether the verdict should be set aside and a new trial ordered rests in the sound discretion of the trial judge, but generally the verdict should stand unless the evidence clearly establishes a serious violation of the juror's duty and deprives a party of a fair trial.[12]

In our opinion the facts do not warrant permitting Lablin's affidavit and testimony to impeach the verdict. His sworn statements are inconsistent with his conduct in many important respects. He was foreman of the jury and presumably led the discussion and deliberations and conducted the voting. After the jury had deliberated for 14 hours and 20 minutes it returned into court and asked for clarification of several instructions. This occurred at 9:20 a. m. November 26, 1964. Lablin as foreman, clearly explained the jury's problem and made no mention of the fact that he or any of the jurors were suffering from mental exhaustion. At 12:12 p. m. the court finally delivered to Lablin, as foreman, a supplemental instruction answering the questions previously asked by him on behalf of the jury. The jury then returned to deliberate. Eighteen minutes later it returned into court with its verdict of guilty. Lablin was the first juror polled and answered that the verdict just read was his true verdict. The total time spent deliberating the issues did not exceed 14 hours and 40 minutes. The mental pressure and exhaustion experienced by Lablin was not shown to have been any greater than that experienced by the other jurors.[13]

Finding no error, the judgment below is affirmed.

10. 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300, 1302 (1915).

11. See Carson v. Brauer, 234 Or. 333, 382 P.2d 79, 85 (1963).

12. State v. Gardner, 230 Or. 569, 371 P. 2d 558, 561 (1962).

13. See Russell v. State, 66 Neb. 497, 92 N.W. 751 (1902) where the jury deliberated 89 hours without access to sleeping facilities, and Jahnke v. State, 68 Neb. 154, 94 N.W. 158 (1903) rev'd on other grounds, 68 Neb. 181, 104 N.W. 154 (1905) where the jury deliberated for six days. Both verdicts were upheld against claims of physical coercion.